J.E., C.E., C.E. Jr., and S.E., as infant plaintiffs by their mother and natural guardian, Victoria EDWARDS, individually, Plaintiffs,

v.

CENTER MORICHES UNION FREE SCHOOL DISTRICT, Center Moriches High School, Center Moriches Board of Education, Dr. Phillip Cicero, in his individual and official capacity, Lino Bracco, in his individual and official capacity, Michael Cruz, in his individual and official capacity, Dr. Bert Nelson, in his individual and official capacity, Tom Kretsos, in his individual and official capacity, Bill Straub, in his individual and official capacity, Marc Trocchio, in his individual and official capacity, and Veronica Tredwell, in her individual and official capacity, Defendants.

No. 05–CV–2735(RRM)(ARL).

United States District Court, E.D. New York.

Sept. 22, 2012.

Frederick K. Brewington, Law Offices of Frederick K. Brewington, Hempstead, NY, for Plaintiffs.

Brian S. Sokoloff, Melissa Lauren Holtzer, Sokoloff Stern LLP, Westbury, NY, Steven C. Stern, Leo Dorfman, Sokoloff Stern LLP, Carle Place, NY, Rondiene Erin Novitz, Gary Edward Dvoskin, Keith V. Tola, Cruser Mitchell & Novitz, LLP, Melville, NY, for Defendants.

### ORDER

ROSLYNN R. MAUSKOPF, District Judge.

By motions filed April 13, 2011, the District Defendants[1] and defendant Tom Kretsos moved for summary judgment of

---

**1.** Capitalized terms have the same meaning as defined in the Report and Recommendation issued on August 7, 2012. (Doc. No. 167.)

all plaintiffs' claims. (Doc. Nos. 157, 158.) By Order entered October 25, 2011, this Court referred those motions to the assigned Magistrate Judge, the Honorable Arlene R. Lindsay, for a Report and Recommendation. On August 7, 2012, Judge Lindsay issued a Report and Recommendation (the "R & R") recommending that this Court grant the motions for summary judgment on the federal claims, decline to exercise supplemental jurisdiction over any state claims, and dismiss those state claims without prejudice. (Doc. No. 167.) On August 22, 2012, plaintiffs filed objections. (Doc. No. 175.) On September 13, 2012, the District Defendants responded thereto (Doc. No. 177), and on September 18, 2012, defendant Kretsos responded thereto (Doc. No. 178). For the reasons set forth below, this Court finds plaintiffs' objections to be without merit, and adopts the thorough and well-reasoned R & R in its entirety.

## DISCUSSION

When reviewing a Report and Recommendation, a district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). When a party raises an objection to an R & R, "the court is required to conduct a *de novo* review of the contested sections." *See Pizarro v. Bartlett*, 776 F.Supp. 815, 817 (S.D.N.Y.1991). However, where an objection consists of "conclusory or general arguments" or is merely an "attempt to engage the district court in rehashing of the same arguments set forth in the original petition," clear error review is appropriate. *DiPilato v. 7–Eleven, Inc.*, 662 F.Supp.2d 333, 339 (S.D.N.Y.2009). Likewise, a district court is not required to review *de novo*, and may instead review for clear error, those portions of a report and recommendation to which no specific objections are addressed. *See Id.*

Notably, plaintiffs do not object to the majority of recommendations to dismiss plaintiffs' causes of action, including dismissal of: the First Amendment Retaliation claim, the municipal liability claims, the conspiracy claims under 42 U.S.C. § 1985 and 1986, the Title VI claims, claims against defendant Dr. Bert Nelson based on quasi-judicial immunity, and the individual claims against defendants Cicero, Bracco, Cruz, Straub, Trocchio, and Treadwell. Although only required to conduct a review for clear error, this Court finds in its *de novo* review that these claims are dismissed for the reasons articulated in the R & R.[2]

However, plaintiffs do object to the recommendations that their substantive due process, procedural due process, and equal protection claims be dismissed. In light of plaintiffs' objections, this Court has reviewed these claims *de novo*.

---

2. The R & R also recommends dismissal of (i) the infant plaintiffs' substantive due process claims based on alleged violations in connection with the disciplinary hearing, imposition of discipline, and the provision of tutoring services, and (ii) the infant plaintiffs' equal protection claims based on alleged violations in connection with the April 4, 2003 incident and the provision of tutoring services. Because plaintiffs have failed to address or respond to any of the defendants' arguments regarding these claims and do not object to these recommendations, this Court finds that these claims have been abandoned and, as such, are dismissed. *See Taylor v. City of New York*, 269 F.Supp.2d 68, 75 (E.D.N.Y.2003). Additionally, the R & R recommends dismissal of plaintiff C.E.'s claim that her substantive due process rights were violated in the school's attempt to force her back to attend school. Because this claim was raised for the first time in plaintiffs' opposition papers, and plaintiffs do not object to this recommendation, this claim is likewise dismissed. *See Casseus v. Verizon N.Y., Inc.*, 722 F.Supp.2d 326, 344 (E.D.N.Y.2010).

Concerning their substantive due process claims, plaintiffs contend that the magistrate judge impermissibly made findings of fact, in favor of the defendants, concerning the extent of plaintiffs' physical and psychological injuries, and the sequence of events related to defendant Kretsos' alleged use of racial epithets and alleged punching of plaintiffs J.E.[3] and C.E.[4] Specifically, plaintiffs assert that their physical and psychological injuries were "substantial," that "Defendant Kretsos yelled racist slurs at Plaintiffs prior to the altercation inside the school building and contemporaneously to punching both female Plaintiffs," and that "at the time Defendant Kretsos punched both infant Plaintiffs [J.E.] and [C.E.] in the face, the altercation had ceased." (Pls. Obj. at 5, 8.) Plaintiffs argue that because they allege substantial injury, it follows that defendant Kretsos must have applied force maliciously or sadistically to plaintiffs J.E. and C.E.; yet, plaintiffs do not cite any case law involving a Fourteenth Amendment substantive due process claim to support their theory. Also, plaintiffs contend that because they allege that defendant Kretsos shouted racial slurs prior to and during the second altercation on April 4, 2003, that it follows there is a genuine issue of material fact whether defendant Kretsos acted maliciously or sadistically. But as the magistrate judge noted, and this Court hold after *de novo* review, there is no evidence, other than the two racial slurs allegedly uttered by defendant Kretsos on April 4, 2003 in the context of two altercations involving multiple students, that defendant Kretsos was motivated by racial animus nor is there any evidence that defendant Kretsos applied force maliciously or sadistically to either J.E. or C.E. Moreover, while neither this Court nor the magistrate judge condones the use of racial slurs, plaintiffs' claims do not rise to the level of a constitutional violation. *See Yap v. Oceanside Union Free Sch. Dist.*, 303 F.Supp.2d 284, 297 (E.D.N.Y.2004) (holding that allegations of racist statements made by school staff to a student was insufficient to raise a substantive due process claim).

Plaintiffs further argue that there is a dispute concerning whether defendant Kretsos was trying to stop the fight when he was alleged to have punched plaintiff J.E. However, this is not a dispute of material fact. However, upon *de novo* review, the uncontroverted evidence demonstrates that defendant Kretsos attempted to stop the fight between J.E. and another student, and even physically interjected himself between the two fighting students. Whether defendant Kretsos punched plaintiff J.E. during the fight—as plaintiff S.E. testified—or immediately after the fight—as plaintiff C.E. testified—is immaterial. It was during the context of attempting to stop an altercation that defendant Kretsos allegedly punched J.E. and C.E. Even taking as true all of the facts exactly as described and characterized in plaintiffs' opposition papers, plaintiffs' substantive due process claims still do not rise to the level of a constitutional violation as a matter of law. *See Smith v. Half Hollow*

---

**3.** Pursuant to Federal Rule of Civil Procedure 5.2., the minor plaintiffs are referenced by their initials in this Order to protect their privacy.

**4.** In support of their arguments concerning improper factual findings, disputed facts, and misapplication of the law, plaintiffs rely on the declaration of Fredrick K. Brewington,

which contains factual averments concerning underlying events that are not within the personal knowledge of the attorney and purport to give the attorney's interpretation of evidence. This is in violation of this Court's individual practices and fails to create a genuine issue of material fact under Federal Rule of Civil Procedure 56.

*Hills Cent. Sch. Dist.,* 298 F.3d 168, 173 (2d Cir.2002) (holding that allegations of a teacher hitting a student for breaking an egg in class was insufficient to raise a substantive due process claim); *Perrin v. Canandaigua City Sch. Dist.,* 08–cv–6135L, 2008 WL 5054241, at *4 (W.D.N.Y. Nov. 21, 2008) (holding that allegations of a gym teacher pulling a student's arms behind his back, forcing the student through a door into the locker room, and punching and poking the student in the chest while berating him with use of foul, profane, and demeaning language was insufficient to raise a substantive due process claim).

Additionally, plaintiffs contend that the defendants violated plaintiff Victoria Edwards' substantive due process rights by filing a PINS petition and making a report to Child Protective Services to have plaintiff C.E. returned to school. In support of their contention, plaintiffs argue that the magistrate judge incorrectly found that plaintiff Victoria Edwards' safety concerns regarding the school environment were subjective. Plaintiffs also assert that the magistrate misstated and misapplied the law concerning the purpose of the PINS action and concerning a liberty interest on behalf of a parent to dictate the educational environment of a child of compulsory education age or a constitutional parental right not to be forced to place such child in a school environment that the parent perceives to be unsafe. However, plaintiffs have not provided, nor did the magistrate judge or this Court find, any case law to support such a claim.

Regarding their procedural due process claims, plaintiffs argue that the magistrate judge erroneously found that plaintiffs had the opportunity to confront witnesses during an administrative disciplinary hearing, and misstated and misapplied the law in considering the tutoring services and the denial of tutoring services. These objections are simply an attempt to rehash the same arguments that the magistrate considered and found deficient. Nonetheless, this Court goes beyond its obligation to review for clear error and finds, in its *de novo* review, that the process afforded to the infant plaintiffs related to their disciplinary hearings, the post-deprivation procedure related to the tutoring, and subsequent denial of tutoring satisfy the requirements of due process. Concerning the disciplinary proceedings, there is no genuine issue of material fact concerning the process afforded to the infant plaintiffs; they were provided (i) timely notice of the pending charges against them, (ii) a full opportunity to present their case at a formal disciplinary hearing prior to the decision to suspend each of them, and (iii) the ability to challenge that suspension on appeal. *See DeFabio v. East Hampton Union Free Sch. Dist.,* 658 F.Supp.2d 461, 489–91 (E.D.N.Y.2009) (holding that due process was afforded where plaintiffs were given written notice of the charges against them, a full opportunity to present their case at a formal hearing prior to the decision to suspend, and provided procedures to challenge the decision). With respect to the adequacy of the tutoring and subsequent denial of tutoring services, it is undisputed that the state provided meaningful post-depravation remedies. Indeed, plaintiff Victoria Edwards challenged the adequacy of the tutoring with the New York State Department of Education; she received notice in writing that the home instruction for infant plaintiff C.E. would end upon the expiration of her suspension from school; and she had the opportunity to address her concerns with school district officials. *See Hellenic Am. Neighborhood Action Comm. v. City of New York,* 101 F.3d 877, 881–82 (2d Cir.1996) (holding that "there is no constitutional violation (and no available § 1983 action)

when there is an adequate state post-deprivation procedure to remedy a random, arbitrary deprivation of property or liberty").

Finally, plaintiffs argue that the magistrate incorrectly recommended dismissal of their equal protection claim because the magistrate judge ignored the plaintiffs' experts' testimony and certain findings regarding selective enforcement. It is apparent that the magistrate did consider evidence of selective enforcement. *See* R & R at 37–43. Nevertheless, plaintiffs' evidence of selective enforcement does not demonstrate that a similarly situated student of a different race or national origin who was involved in a fight, riot, or physical altercation with a security guard was more favorably treated than the infant plaintiffs. Thus, because no rational juror could find that plaintiffs have shown they were treated differently than other similarly situated individuals, plaintiffs claim fails as a matter of law. *See Vassallo v. Lando,* 591 F.Supp.2d 172, 184–85 (E.D.N.Y.2008) (granting summary judgment on equal protection claim where student-plaintiff failed to raise a genuine issue of material fact over whether student-plaintiff was treated differently than other similarly situated students).

## CONCLUSION

Upon a *de novo* review of Judge Lindsay's thorough and well-reasoned R & R, and the factual and procedural record upon which it is based, plaintiffs' objec- tions are overruled, and the R & R is adopted in its entirety. Accordingly, defendants' motions for summary judgment on all federal claims are GRANTED. Further, this Court declines to exercise supplemental jurisdiction over plaintiffs' state claims. The Clerk of the Court is directed to enter Judgment accordingly and to close the case.

SO ORDERED.

## REPORT AND RECOMMENDATION

LINDSAY, United States Magistrate Judge:

Plaintiffs J.E., C.E., C.E. Jr., S.E. (referred collectively as the "infant plaintiffs" or the "Edwards children") as infant plaintiffs by their mother and natural guardian, Victoria Edwards ("Victoria" or the "infant plaintiffs' mother"), and individually (collectively "plaintiffs") bring this action pursuant to 42 U.S.C. Section 2000d et seq., 42 U.S.C. §§ 1983, 1985, 1986, the First, Fifth and Fourteenth Amendments to the United States Constitution and state law against defendants Center Moriches Union Free School District ("District"), Center Moriches High School ("High School"), Center Moriches Board of Education ("Board of Education"), Dr. Phillip Cicero [1] ("Cicero"), in his individual and official capacity, Lino Bracco [2] ("Bracco"), in his individual and official capacity, Michael Cruz [3] ("Cruz"), in his individual and official capacity, Dr. Bert Nelson [4] ("Nelson"), in his individual and official capacity, Bill Straub [5] ("Straub"), in his individual and

---

1. Cicero was the Superintendent of the District during the 2002–2003 school year and left employment with the District in 2004. (Dist. Defs. 56.1 Stmt. ¶¶ 3–4.)

2. Bracco was the Principal of the High School during the 2002–2003 school year. (*Id.* ¶ 5.)

3. Cruz was the Assistant Principal of the High School during the 2002–2003 school year. (*Id.* ¶ 6.)

4. Nelson was never an employee of the District, but was retained as a hearing officer for the District. (*Id.* ¶¶ 8, 274.)

5. Straub was employed by the District as a security guard in the High School during the 2002–2003 school year. (*Id.* ¶ 10.)

official capacity, Marc Trocchio (s/h/a Marc Trochhio) [6] (hereinafter "Trocchio"), in his individual and official capacity, Veronica Treadwell [7] (s/h/a Veronica Tredwell) (hereinafter "Treadwell"), in her individual and official capacity, (hereinafter all defendants except Tom Kretsos collectively the "District Defendants") and defendant Tom Kretsos [8], in his individual and official capacity, ("defendant Kretsos").[9] The claims relate to events at Center Moriches High School on April 4, 2003, while the infant plaintiffs were students at the school, and the school officials' decisions on that day, and in the time period that followed with respect to the infant plaintiffs. Before the court, on referral from District Judge Mauskopf, are the District Defendants' and defendant Kretsos' motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the following reasons, the undersigned recommends that the district court grant the (i) the motions for summary judgment on the federal claims; and (ii) decline to exercise supplemental jurisdiction over any state claims and dismiss those claims without prejudice.

## BACKGROUND

The material facts, drawn from the Complaint and the parties' Local 56.1

Statements, are construed in the light most favorable to the non-moving party, except as otherwise noted.[10] *See Iannuzzi v. American Mortg. Network, Inc.,* 727 F.Supp.2d 125, 130–31 (E.D.N.Y.2010); *see also Capobianco v. City of New York,* 422 F.3d 47, 54–55 (2d Cir.2005).

The Center Moriches Union Free School District (the "District") is located in Suffolk County and administers the Center Moriches High School (the "High School"). (Dist. Defs. 56.1 Stmt. ¶¶ 1–2.) [11] Plaintiffs are Native–American and African–American individuals, and they reside on, and are members of, the Unkechaug Indian Reservation. (Compl. ¶ 1.) During the school year of 2002–2003, the infant plaintiffs were enrolled in the District and attended the High School. (Dist. Defs. 56.1 Stmt. ¶ 16.)

## I. Factual Background

### a. The April 4, 2003 Altercation on School Grounds

On April 4, 2003, at the beginning of the tenth period of the school day, J.E. observed an argument between two students in the school lobby which continued outside the school. (Pls. 56.1 Stmt. ¶¶ 47, 51, 58–

6. Trocchio was employed by the District as a guidance counselor in the High School during the 2002–2003 school year. (*Id.* ¶ 13.)

7. Treadwell was employed by the District and served as a liaison between the District and the Unkechuag Indian nation during the 2002–2003 school year. (*Id.* ¶ 14.)

8. Kretsos was employed by the District as a security guard at the High School during the 2002–2003 school year. (*Id.* ¶ 9.)

9. Plaintiffs entered into a Stipulation of Discontinuance as to defendant Harry Wallace on October 31, 2008 and as to defendant Center Moriches Teachers Association on August 23, 2011.

10. The District Defendants and defendant Kretsos have each submitted their 56.1 Statements pursuant to Local Civil Rule 56.1. The court notes that the plaintiffs' have proffered a "Statement of Disputed Facts pursuant to Local Rule 56.1 and Counter–Statement of Fact" and in addition a "Plaintiffs' 56.1 Statement of Disputed Facts." The court will cite principally to the Rule 56.1 Statement which corresponds to defendants' respective Local Civil Rule 56.1 Statement, unless otherwise specified.

11. Where only one party's 56.1 statement is cited, that fact is undisputed or the opposing party has offered to no evidence to controvert that fact.

59, 63, 64, 66; *Brewington Decl.*, Ex. L at 83–89.) Knowing that a fight was about to happen, J.E. exited the school building, along with a crowd of students, and a melee ensued. (*Id.; Brewington Decl.*, Ex. J at 56–58.) A fist fight broke out which expanded to include at least five students, including J.E. and R.W., an African–American female student at the High School. (*Brewington Decl.*, Exs. L at 86–88, 90–92, 97–103; J at 57–59, 61–62.) There were numerous fights occurring outside. (Pls. 56.1 Stmt. ¶ 121.) When J.E. saw R.W. yelling and screaming at her brother C.E. Jr., she took off her shoes, removed her jewelry, and ran over to defend her brother. (Pls. 56.1 Stmt. ¶¶ 72–73; *Brewington Decl.*, Ex. L at 90–96, 102.) J.E. and R.W. exchanged verbal obscenities which led to a physical altercation between them. (Dist. Defs. 56.1 Stmt. ¶¶ 74, 77–80.) J.E. punched R.W. in the face, R.W. fell backwards and her cousin KC caught her. (*Id.* ¶¶ 77–81.) J.E.'s brothers C.E. Jr. and S.E. broke up the fight between the girls. (Pls. 56.1 Stmt. ¶ 84; *Brewington Decl.*, Exs. J at 61–64; K at 61–66; O at 26–28.) When J.E.'s sister C.E. arrived at the scene, there was a crowd of students, a lot of movement and chaos outside. (Pls. 56.1 Stmt. ¶ 94.) J.E. had to be restrained by her brother S.E. who pushed her back towards the school building, and C.E. followed them. (*Brewington Decl.*, Ex. L at 104–06.)

By this point security guards and other District staff were attempting to intervene. (Pls. 56.1 Stmt. ¶ 88; Dist. Defs. 56.1 Stmt. ¶ 88.) In trying to break up the fights outside, security guard Gregory Gates' toe was broken. (Dist. Defs. 56.1 Stmt. ¶ 118.) Upon hearing about the melee, Assistant Principal Cruz ran outside where there were a number of students yelling and challenging each other. (Pls. 56.1 Stmt. ¶¶ 92–93; Dist. Defs. 56.1 Stmt. ¶¶ 92–93.) The administrators, including defendant Bracco, instructed the students to return to the school building. (*Id.* ¶¶ 117, 119.) As S.E. brought J.E. back to the school building, security guard Kretsos followed behind S.E., and according to J.E. was saying, "All you bunch of niggers are going to jail. All you bunch of niggers are getting locked up." (*Brewington Decl.*, Ex. L at 105.)

**b. The Altercation Inside the School**

Inside the school, there were many students waiting for the late bus in the lobby, as well as a crowd of students, teachers and guards in the hallway. (Pls. 56.1 Stmt. ¶¶ 121–22.) Once inside the crowded lobby the fight between R.W. and J.E. broke out again with them trading swings, tussling and grappling with each other. (*Brewington Decl.*, Exs. I at 66–68; K at 68–69, 242–43; R at 33.) J.W., R.W.'s sister, joined the fracas which prompted J.E.'s sister C.E. to intervene. (*Id.*, Exs. R at 33–34; I at 65–66.) Security guard defendant Kretsos attempted to break up the fight between R.W. and J.E. by wedging his body between the combatants. (Dist. Defs. 56.1 Stmt. ¶¶ 125–27; *Brewington Decl.*, Exs. K at 66–68, 243–45; R at 33.) Kretsos unsuccessfully tried to separate the girls by pulling R.W. out of the altercation, but this did not stop the fight as the two students continued to battle. (Dist. Defs. 56.1 Stmt. ¶¶ 127–29; *Brewington Decl.*, Exs. I at 68; K at 68–72, 247–48.) When Kretsos told J.E. that the police were called, J.E. demanded, "Why are you calling the police?" (Dist. Defs. 56.1 Stmt. ¶¶ 130–31.) The parties disagree about what transpired next.

According to defendants, J.E. then pushed Kretsos, C.E. hit him in the face and S.E. hit Kretsos in the back of the head as Kretsos put his arms up and tried to push S.E. and C.E. out of the way in an effort to defend himself. (Dist. Defs. 56.1

Stmt. ¶¶ 134–38, 145; *Stern Decl.*, Ex. Q at 21–22.) Plaintiffs deny that J.E. ever pushed Kretsos but assert that when Kretsos came in between J.E. and R.W. to break up the fight, he tried to pull R.W. out of the tussle, was unsuccessful, and punched J.E. once in the face. (Pls. 56.1 Stmt. ¶ 133; *Brewington Decl.*, Ex. K at 68–72.) According to plaintiffs, when C.E. came towards Kretsos and protested, Kretsos also punched her once in the face, which prompted both C.E. and S.E. to punch Kretsos before he could be pulled away from the pile. (Pls. 56.1 Stmt. ¶¶ 134–38; *Brewington Decl.*, Ex. K at 86–88.) Kretsos sustained injuries on the left and right side of his head. (Dist. Defs. 56.1 Stmt. ¶ 147.) Plaintiffs assert that Kretsos allegedly shouted racial epithets [12] and threats towards the infant plaintiffs during the altercations both inside and outside the High School. (Pls. Ctr. Stmt. ¶¶ 54, 69, 77–80, 99–101; Compl. ¶¶ 30, 39.)

Principal Bracco intervened to control the situation. (Dist. Defs. 56.1 Stmt. ¶ 148.) Bracco got between the plaintiffs and Kretsos, and pushed Kretsos towards the bathroom. (*Id.* ¶ 149.) Bracco asked defendant Trocchio for his assistance in trying to control the situation. (*Id.* ¶ Bracco and Trocchio moved Kretsos into the girls' bathroom, and Bracco tried to calm him down. (*Id.* ¶¶ 151, 154.) Trocchio stayed with Kretsos for a period of time in the girls' bathroom. (*Id.* ¶ 155.) J.E. was escorted to Bracco's office. (*Id.* ¶¶ 157–58.) By the time Bracco stepped out of the girls' bathroom, the hallway was cleared, coinciding with the presence of the Suffolk County Police in the lobby of the school building. (*Id.* ¶¶ 162–63.) S.E.,

C.E. Jr., and C.E. joined J.E. and Bracco in Bracco's office. (*Id.* ¶ 164.)

### c. The Aftermath

Linda DeHoyos, a parent of a child in the High School, came into the Principal's Office and offered to take the Edwards children home. (*Id.* ¶¶ 176–78.) Bracco allowed DeHoyos to take them and she escorted the Edwards children outside. (*Id.* ¶¶ 179–80.) The police approached C.E. Jr. to question him, but C.E. Jr. informed them that he would not to talk to them because he was a minor and his parents were not present, and he advised his brother S.E. not to answer the police's questions for the same reason. (*Id.* ¶¶ 184–85.) C.E. Jr. and S.E. went home by bus, and J.E. and C.E. got into DeHoyos' car. (*Id.* ¶ 188.) On their way home, J.E. and C.E. saw their cousin Robin Hughes driving towards the High School, and they asked DeHoyos to bring them back to the school. (*Id.* ¶ 189.) Once at school, they waited in Hughes' van for their father, Curtis Edwards, Sr. to arrive at the school. (*Id.* ¶ 190.) When the infant plaintiffs arrived home, S.E. told his mother, Victoria Edwards, what had transpired and she brought her children back to the High School. (*Id.* ¶ 192.) At the school, Bracco, Cruz and Cicero were in the lobby. (*Id.* ¶ 193.) The parties, however, dispute whether or not J.E. and her parents accompanied Bracco into his office to discuss the incident. (Pls. 56.1 Stmt. ¶¶ 194–97; Dist. Defs. 56.1 Stmt. ¶¶ 194–97.) Once the Edwards family left the High School on April 4, 2003, they did not return that day. (Dist. Defs. 56.1 Stmt. ¶ 198.) J.E., C.E., C.E. Jr. and S.E. were each suspended for five days pending a superintendent's hearing, and several of

---

12. Specifically, plaintiffs allege that Kretsos yelled, "All you bunch of niggers are going to jail," and "You niggers are all getting fucking arrested," (Comp. ¶ 30), and in response to C.E. shouted, "All you fucking niggers are getting arrested and going to jail you black bitch," (*id.* at ¶ 39).

the other students involved in the altercation were suspended as well. (*Id.* ¶¶ 199–200.)

### d. The Investigation into the Incident

Bracco conducted an investigation into the April 4, 2003 incident, questioning the security guards who were on duty and other staff members and securing written statements from a number of witnesses and participants. (*Id.* ¶¶ 205–07.) By Memorandum dated April 7, 2003, Bracco summarized the results of his investigation for Superintendent Cicero. (*Id.* ¶ 215.) Cicero suspended defendant Kretsos for thirty days without pay. (*Id.* ¶ 221.)

### e. Disciplinary Charges

As a result of the April 4, 2003 incident, the District brought disciplinary charges against J.E., C.E., C.E. Jr. and S.E. (*Id.* ¶ 225.) In addition, the District brought twenty-eight counts of disciplinary chargers against R.W., and she was suspended for six months. (*Id.* ¶¶ 226–27.) S.A. and J.W. were also suspended for fighting in the April 4, 2003 incident. (*Id.* ¶¶ 228–29.) Mr. and Mrs. Edwards were notified of the charges by letter dated April 10, 2003. (*Id.* ¶ 230.)

### f. The Disciplinary Hearings

The infant plaintiffs' disciplinary hearings took place over the course of five days: April 14, 2003, April 30, 2003, May 5, 2003, May 7, 2003 and May 12, 2003, and at the plaintiffs' request, the four disciplinary hearings were held simultaneously. (*Id.* ¶¶ 267, 273.) Plaintiffs were permitted to present witnesses and evidence during the hearing and were represented by counsel. (*Id.* ¶¶ 268–270.) The District retained defendant Dr. Bert Nelson as hearing officer for the matter. (*Id.* ¶ 274.) At the hearing, J.E., C.E., C.E. Jr. and S.E. testified before Dr. Nelson. (*Id.* ¶ 287.) In addition, defendants Bracco, Cruz, Trocchio, Treadwell as well as other school staff members, parents and students testified at the hearing. (*Id.* ¶ 288.) In making his decision, Dr. Nelson testified that he did not consider anything other than the testimony and exhibits that were presented during the hearing. (*Id.* ¶ 342.)

### g. Dr. Nelson's Decision

Following the hearings, Dr. Nelson issued a 40–page Hearing Officer Report (the "Report") of his findings and recommendations dated May 18, 2003. (*Id.* ¶ 345.) Dr. Nelson found that on the afternoon of April 4, 2003, there was a riot at the High School and that the conduct of J.E., S.E. and C.E. on that day reflected their participation in inciting the riot that took place. (*Id.* ¶¶ 353, 359, 362.) With respect to J.E., the Report found that she engaged in a verbal and physical altercation with another student; was one of the people who had initiated the physical altercation; did not follow the appropriate directions of the staff; used inappropriate language during the events of April 4, 2003; and continued to engage in a verbal and physical altercation despite directives from District staff to stop. (*Id.* ¶¶ 348–54.) With respect to S.E., the Report found that he verbally threatened a security guard; used inappropriate language toward district staff; physically attacked a security guard; and did not follow the appropriate directions of school staff. (*Id.* ¶¶ 355–58.) Dr. Nelson found that although C.E. had a limited role in the events, she did attack a security guard. (*Id.* ¶ 360.) Dr. Nelson found that C.E. did not follow the directions of the Principal. (*Id.* ¶ 364.)

Dr. Nelson concluded that based on the evidence J.E. was guilty of 12 out 14

charges brought against her; S.E. was guilty of all 10 charges brought against him; C.E. was guilty of 4 of the 6 charges brought against her; and C.E. Jr. was guilty of 2 of the 14 charges brought against him. (*Id.* ¶¶ 367–70.) After Nelson rendered a decision as to the charges,[13] he heard evidence with regard to the penalties to be assessed, including evidence of the infant plaintiffs' prior disciplinary histories. (*Id.* ¶¶ 371, 374.)

### h. Dr. Nelson's Recommendations

In a Hearing Officer's Report dated May 18, 2003, Dr. Nelson recommended that C.E. Jr. be suspended through June 30, 2003; C.E. be suspended through October 31, 2003; S.E. be suspended through June 30, 2004; and J.E. be suspended permanently. (*Id.* ¶¶ 495–500.) In recommending that J.E. be suspended permanently, Dr. Nelson noted, referring to this incident as well as past transgressions that:

> [J.E.] is a student out of control. She has not and does not respond to the appropriate directions of staff. She is consistently insubordinate and she is an ongoing threat to the safety, morals, health and welfare of everyone in the school community. She does as she pleases when she pleases, and she has neither respect nor regard for school authorities.
>
> [J.E.] is equally insubordinate to paraprofessionals, security guards, teachers, the Assistant Principal and the Principal. A student who cannot be expected to follow the rules and who chooses to ignore the instructions of school authorities is an imminent and continuing dan-

ger to all. No school should knowingly tolerant this consistent level of misconduct, nor should other students or adults be constantly at risk of the consequences of such intolerable misbehavior. (*Id.* ¶ 501.)

In addition, Dr. Nelson recommended that during the suspension periods, the Edwards children not be permitted to enter the buildings or grounds of the District and alternate instruction and/or special services be provided for them. (*Id.* ¶¶ 502–03.)

Dr. Cicero adopted the recommendations of Dr. Nelson. (*Id.* ¶¶ 504–05.) Dr. Cicero considered the Edwards children's prior disciplinary histories and adopted the disciplinary determinations made by Dr. Nelson for S.E., C.E. Jr., C.E. and J.E. (*Id.* ¶¶ 506–10.) The District informed plaintiffs of the Superintendent's decision by letters dated May 27, 2003. (*Id.* ¶ 520.)

### i. Home Tutoring

During the period of the their suspensions, the District provided the Edwards children with home tutoring services. (*Id.* ¶ 529.) During the summer of 2003, the infant plaintiffs received tutoring, and C.E. received home tutoring services throughout her suspension. (*Id.* ¶¶ 530–31.) In an appeal to the New York State Education Department, Victoria Edwards challenged the adequacy of the tutoring services provided to her children. (*Id.* ¶ 535.) The Commissioner of the New York State Education Department dismissed Victoria's challenge in a decision dated November 19, 2003, finding that Victoria had failed to meet her burden of proving that the alternative instruction provided by the

---

**13.** Dr. Nelson's Report made findings exclusively with respect to the disciplinary charges brought against the infant plaintiffs. (*Stern Aff.,* Ex. KK.) Disciplinary charges brought against other students and staff who were involved in the incident were conducted in separate hearings by Dr. Nelson and others. (*Id.,* Exs. Q at 92; V at 46, 175, 240; W at 21.)

District was inadequate. (*Id.* ¶ 536.) In dismissing the appeal, the Commissioner noted that, "although petitioner initially rejected many of the scheduling options offered by the tutor, the hearing examiner facilitated an agreement between petitioner and respondent on a schedule for instruction." (*Id.* ¶ 537.)

By letter dated November 14, 2003, Rosemarie Seitelman, Director of Special Services, informed plaintiffs that J.E. and S.E.'s tutor was unable to continue working with them (as she received a full time teaching position), and that beginning November 17, 2003, the District would provide J.E. and S.E. with new tutors in every subject. (*Id.* ¶¶ 544–45.) By letter dated June 24, 2004, Ms. Seitelman informed plaintiffs that J.E. and S.E. were eligible to receive tutoring services through the summer. (*Id.* ¶ 546.)

### j. Person in Need of Supervision ("PINS") Petition

On October 31, 2003, C.E.'s suspension expired and she was due to return to school on November 3, 2003. (*Id.* ¶¶ 548–49.) Victoria refused to allow C.E. to return to school, citing fear of mistreatment and retaliation, and requested continued home instruction for her daughter. (*Id.* ¶¶ 550–51.) By letter dated November 10, 2003, Laura A. Ferrugiari, counsel for the District, informed plaintiffs' counsel that the District provides a safe learning environment and explained that unless C.E. could identify with specificity what or whom she feared, the District would have to deny the request for continued home instruction. (*Id.* ¶ 552.) Thereafter, in a second letter, dated November 18, 2003, Ms. Ferrugiari informed plaintiffs' counsel that C.E. had not returned to school, that she was required to attend school regularly, and that if she "continues her pattern of nonattendance, the District will have no

choice but to file a PINS petition with Family Court." (*Id.* ¶¶ 553–54.) By letter dated November 20, 2003, Patricia Cunningham, Middle School Principal, informed plaintiffs, that since the expiration of her suspension, C.E. had accrued a total of twelve (12) unexcused absences. (*Id.* ¶ 555.) On January 21, 2004, when C.E. had not returned to school, the District filed a PINS Petition in Family Court of the State of New York, County of Suffolk. (*Id.* ¶ 557.)

### II. Procedural History

In May 2003, Victoria Edwards filed a complaint with the United States Department of Education, Officer of Civil Rights ("OCR"), alleging that the District discriminated against plaintiffs in the way it handled the April 4, 2003 altercation at the High School, the subsequent discipline and the tutoring services. (*Id.* ¶ 560.) By letter dated July 17, 2003, OCR advised plaintiffs that it had rejected a number of plaintiffs' allegations, but that it was proceeding with allegations regarding harassment on the basis of race and discrimination with respect to the imposition of discipline. (*Id.* ¶¶ 561; *Stern Decl.*, Ex. MM.) By letter dated July 17, 2003 Victoria Edwards was advised that because there was no evidence to support their allegation, the OCR would not take further action regarding that allegation. (*Stern Decl.*, Ex. MM.)

Plaintiffs did not appeal the disciplinary decisions to the District's Board of Education, but instead appealed the disciplinary determinations to the New York State Education Department. (Dist. Defs. 56.1 Stmt. ¶¶ 521–22.) In a decision dated November 19, 2003, the Commissioner of the New York State Education Department dismissed the appeal. (*Id.* ¶ 523.) On November 20, 2003, plaintiffs entered into a Stipulation and Release with the District

that provided J.E., S.E. and C.E. would attend school in the South Country Central School District at Bellport High School during the 2004–2005 school year and thereafter. (*Id.* ¶ 524.)

On June 7, 2005, plaintiffs commenced the instant action. The infant plaintiffs assert the following causes of action: (1) violations of equal protection pursuant to 42 U.S.C. § 1983 ("Section 1983") as to defendants District, High School, Board of Education, Cicero, Bracco, Cruz, Trocchio, Kretsos and Straub; (2) violations of procedural due process and selective enforcement pursuant to Section 1983 as to defendants District, High School, Board of Education, Cicero, Bracco, Cruz, Trocchio and Nelson; (3) conspiracy to violate procedural and substantive due process pursuant to 42 U.S.C. § 1985 ("Section 1985") as to defendants District, High School, Board of Education, Cicero, Bracco, Cruz, Trocchio, Kretsos and Straub; (4) violations of procedural and substantive due process, equal protection, the right to a safe school environment, a public school education and free from unlawful retaliation pursuant to 42 U.S.C. § 1986 as to defendants District, High School, Board of Education, Cicero, Bracco, Cruz, Trocchio, Treadwell, Nelson, Kretsos; (5) discrimination on the basis of race and national origin in violation of Section 1983 as to defendants District, High School and Board of Education; (6) discrimination on the basis of race and national origin in violation of Title IX as to defendants District, High School and Board of Education; (7) discrimination on the basis of race and national origin in violation of Title IX as to defendant Treadwell; (8) violations of equal protection pursuant to 42 U.S.C. § 1983 as against defendant Treadwell; (9) discrimination on the basis of race and national origin in violation of New York State Education Law Section 3201 ("Educ. Law § 3201") as to defendants District,

High School and Board of Education; (10) violations of the right to education and instruction pursuant to New York State Education Law Section 3204 ("Educ. Law § 3204") as to defendants District, High School and Board of Education; (11) negligent supervision and training as to the defendants District and High School; and (12) negligence as to defendants District and High School.

Plaintiffs J.E. and C.E. assert the following causes of action: (1) assault and battery as to defendant Kretsos; and (2) vicarious liability for the battery cause of action as to defendants District and High School. Plaintiff Victoria Edwards asserts the following causes of action: (1) violations of equal protection and freedom of expression pursuant to Section 1983 as to defendants District, High School, Board of Education, Cicero, Bracco, Cruz, Trocchio, and Kretsos; (2) conspiracy to violate procedural and substantive due process pursuant to 42 U.S.C. § 1985 ("Section 1985") as to defendants District, High School, Board of Education, Cicero, Bracco, Cruz, Trocchio, Kretsos and Treadwell; (3) intentional infliction of emotional distress as to "defendants"; and (4) punitive damages against "defendants" on behalf of all plaintiffs.

The District Defendants and defendant Kretsos now move for summary judgment pursuant to Fed.R.Civ.P. 56.

## DISCUSSION

### I. Summary Judgment Standards

 Summary judgment is proper only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "An issue of fact is

genuine if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir.2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). In determining whether an issue is genuine, "[t]he inferences to be drawn from the underlying affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion." *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 202 (2d Cir.1995) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962) (per curiam)); *see DeFabio v. East Hampton Union Free Sch. Dist.*, 623 F.3d 71, 74 (2d Cir.2010).

Once the moving party has met its burden, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed. R.Civ.P. 56(e)). The nonmoving party cannot survive summary judgment by casting mere "metaphysical doubt" upon the evidence produced by the moving party. *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348. Summary judgment is appropriate when the moving party can show that "little or no evidence may be found in support of the nonmoving party's case." *Gallo v. Prudential Residential Servs., Ltd.*, 22 F.3d 1219, 1223–24 (2d Cir.1994) (citations omitted). However, "the judge's role in reviewing a motion for summary judgment is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505.

## II. Section 1983 Claims

Section 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ..., subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law....

42 U.S.C. § 1983. In order to state a cause of action pursuant to Section 1983, plaintiffs must allege injury by either a state actor or a private party acting under color of state law. *See Ciambriello v. County of Nassau*, 292 F.3d 307, 323 (2d Cir.2002); *see also Commodari v. Long Island Univ.*, 89 F.Supp.2d 353, 372 (E.D.N.Y.2000). A municipality and other local government units are "persons" subject to suit under Section 1983 for the deprivation of a constitutionally protected right. *See Monell v. Dept. of Soc. Servs. of the City of New York*, 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Town of Orangetown v. Magee*, 88 N.Y.2d 41, 48, 643 N.Y.S.2d 21, 665 N.E.2d 1061 (1996); *see also Alex LL. v. Dept. of Soc. Servs.*, 60 A.D.3d 199, 872 N.Y.S.2d 569 (3rd Dep't 2009). Because "Section 1983 is not itself a source of substantive rights but merely provides a method for vindicating federal rights elsewhere conferred ... [t]he first step in [analyzing] any claim is to identify the specific constitutional right allegedly infringed." *Albright v. Oliver*, 510 U.S. 266, 271, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (internal quotation marks and citations omitted); *see Sykes v. James*, 13 F.3d 515, 519 (2d Cir.1993) ("Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere"). Plaintiffs assert constitutional violations of substantive due process of

law, procedural due process of law, equal protection of law and free speech which the Court will address in turn.

## A. Substantive Due Process

 The Due Process Clause of the Fourteenth Amendment "provides that certain substantive rights—life, liberty, and property—cannot be deprived except pursuant to constitutionally adequate procedures." *Desir v. Board of Co-op. Educ. Servs.*, No. 07–CV–1994 (RRM), 2008 WL 4508735, at *2 (E.D.N.Y. Sept. 30, 2008) (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985)). The infant plaintiffs contend that defendants deprived them of their liberty interest in freedom from "unjustified intrusions on personal security," *see Ingraham v. Wright*, 430 U.S. 651, 673, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977), on April 4, 2003 by failing to provide a safe environment for plaintiffs free from excessive force and/or verbal abuse.[14] Specifically, plaintiffs assert that their substantive due process rights were violated when the District defendants allegedly (a) permitted Kretsos to punch J.E. and C.E., subjected the infant plaintiffs to racial slurs, and defendants failed to intervene to stop Kretsos; (b) failed to intervene in the students' altercations; and (c) attempted to force C.E. back to attend school in an unsafe environment. In addition, plaintiff Victoria alleges her substantive rights were violated when the District defendants filed a PINS action and allegedly made false reports to Child Protective Services to force her daughter C.E. back to school. As set forth below, plaintiffs have failed to present evidence to create a genuine issue of material fact on their substantive due process claims; rather the undisputed facts demonstrates that the claims fail as a matter of law.

 "Among the liberties protected by the Due Process Clause of the Fourteenth Amendment is a right to be free from ... unjustified intrusions on personal security." *Matican v. City of New York*, 524 F.3d 151, 155 (2d Cir.2008). The Second Circuit has made clear, however, that "[o]nly an affirmative act can amount to a violation of substantive due process, because Due Process is phrased as a limitation of the State's power to act, not as a guarantee of certain minimal levels of safety and security." *Lombardi v. Whitman*, 485 F.3d 73, 79 (2d Cir.2007). "Moreover, state action resulting in bodily harm is not a substantive due process violation unless the state action was so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Chambers*

14. The District Defendants seek summary judgment with respect to the infant plaintiffs' substantive due process claims based on alleged violations in connection with the disciplinary hearing, imposition of discipline and the provision of tutoring services. In their opposition papers, plaintiffs failed to address or respond to any of defendants' arguments regarding these claims. "Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way." *Taylor v. City of New York*, 269 F.Supp.2d 68, 75 (E.D.N.Y.2003) (citing *Douglas v. Victor Capital Group*, 21 F.Supp.2d 379, 393 (S.D.N.Y. 1998) (collecting cases)); *accord Santiago v. City of New York*, No. 05–CV–3668 (RRM)(VVP), 2009 WL 935720, at *11 n. 19 (E.D.N.Y. Mar. 31, 2009) (finding First Amendment retaliation claim abandoned by virtue of plaintiff's failure to pursue such a claim in her opposition papers); *Sorto–Romero v. Delta Int'l Machinery Corp.*, No. 05–CV– 5172 (SJF)(AKT), 2007 WL 2816191, at *9 (E.D.N.Y. Sept. 24, 2007) (finding claim "abandoned by virtue of his failure to address [it] in his memorandum responding to defendant['s] summary judgment motion"). The undersigned therefore deems these claims abandoned and recommends that the district court grant summary judgment in favor of the District Defendant with respect to these claims.

*v. North Rockland Centr. Sch. Dist.,* 815 F.Supp.2d 753, 763 (S.D.N.Y.2011) (internal quotation marks and citations omitted); *see County of Sacramento v. Lewis,* 523 U.S. 833, 847, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) (finding it established that "conduct that shock[s] the conscience and [i]s so brutal and offensive that it d[oes] not comport with traditional ideas of fair play and decency ... violate[s] substantive due process") (internal quotation marks and citation omitted); *see also Smith v. Half Hollow Hills Cent. Sch. Dist.,* 298 F.3d 168 (2d Cir.2002) (holding that the "protections of substantive due process are available only against egregious conduct which goes beyond merely offend[ing] some fastidious squeamishness or private sentimentalism and can fairly be viewed as so brutal and offensive to human dignity as to shock the conscience") (internal quotation marks and citations omitted). The Supreme Court has emphasized that "[o]ur Constitution deals with the large concerns of the governors and the governed, but it does not purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society." *Daniels v. Williams,* 474 U.S. 327, 332, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986).

The threshold for establishing a constitutional tort in a school environment is high. At one end of the continuum, for example, the Second Circuit held in *Johnson v. Newburgh Enlarged Sch. Dist.,* 239 F.3d 246, 252–55 (2d Cir.2001), that a gym teacher's assault on a student constituted a violation of the student's substantive due process right to be free from the use of excessive force. In *Johnson,* after an eighth grade student threw a dodge ball toward his gym teacher a distance of approximately twenty feet, the teacher grabbed the student by the throat, yelled "I'll kick the shit out of you", lifted him off the ground by his neck, dragged him across the gym floor, choked him, slammed his head into the bleachers four times, slammed his head into a metal fuse box and punched him in the face. *Id.* at 249. The Second Circuit stated that viewed objectively, the alleged assault was conscience shocking because it constituted malicious and sadistic conduct, was "extremely violent," likely to produce substantial injury, and could not have served any government interest. *Id.* at 252.

By way of contrast, at the other end of the spectrum, the Second Circuit in *Smith* ruled that a technology teacher's conduct did rise to the level of egregious conduct so as to constitute a violation of a student's substantive due process rights. 298 F.3d at 173. In *Smith,* after a seventh grade student conducted an exercise which involved balancing an egg on the edge of his desk wherein the egg cracked through no fault of his own, the teacher struck the student in the face at full force with an open hand, causing him severe physical and emotional pain for which he underwent psychotherapy. *Id.* at 170. The Court held that under the relevant circumstances of the case, it was clear as a matter of law, that the teacher's conduct, "though regrettable, simply [wa]s not of constitutional proportions." *Id.* at 173. The conduct did not rise to conscience shocking behavior because although "[s]triking a student without any pedagogical or disciplinary justification ... is undeniably wrong ... not all wrongs perpetrated by a government actor violate due process." *Id.* Important to its holding was "the Supreme Court's admonition that executive action challenges raise a particular need to preserve the constitutional proportions of claims, lest the Constitution be demoted to ... a font of tort law." *Id.* at 173. The court noted that while there is no "per se rule that a single slap from a teacher or other school official can never

be sufficiently brutal to shock the conscience and invoke the protections of the due process clause," in that case the single slap fell short of the threshold for establishing a constitutional claim. *Id.*

■ Viewing the facts in the light most favorable to plaintiffs, the court is likewise constrained to conclude that Kretsos' alleged conduct in this case does not rise to the level of "egregious conduct ... so brutal and offensive to human dignity as to shock the contemporary conscious" and constitute a constitutional violation.[15] That is not to say that the undersigned condones such alleged conduct.

Construing the facts in plaintiffs' favor, the incident giving rise to plaintiffs' substantive due process claims occurred on April 4, 2003. The evidence shows that during the afternoon of that day there was a volatile situation at the High School. Students were involved in a melee which was clearly difficult to control. The plaintiff J.E., who was at the center of much of the trouble, was engaged in a physical brawl with another student R.W. and was difficult to restrain despite the efforts of her own brother and Kretsos. The brawl began first outside the school building, and then continued in the school lobby. (*Stern Decl.*, Exs. I at 242–43; J at 33–34; K at 65, 68). There is no dispute that Kretsos was trying to stop the fight between J.E. and R.W.[16] when he is alleged to have punched J.E. one time. The altercation between the two students had reached such a fever pitch that despite Kretsos physically interjecting himself between J.E. and R.W., they continued to flail at each other. (*Id.* at Ex. I at 68–69; *Brewington Decl.*, Ex. K at 246–47.) To the extent Kretsos applied force against J.E. it was clearly out of frustration in his attempt to "break up the fight," and did not constitute malicious and sadistic conduct. (*Stern Decl.*, Ex. I at 69, 71–72.)

There is no indication that Kretsos applied force with the intent to injure J.E., but rather the evidence shows he was reacting to the situation and attempting to contain the fighting. In fact, C.E. acknowledged that Kretsos "was breaking up everything," and S.E.'s testimony[17] at his

---

**15.** In so holding, the undersigned expresses no view with respect to the merits of any state law claims available to plaintiffs. *Smith*, 298 F.3d at 173 n. 2.

**16.** Notably, this was not the first altercation between J.E. and R.W. at the school as the two students had engaged in prior similar conduct and such information was known to school officials. (*Brewington Decl.*, Ex. L at 65, 73–79.) For example, at her deposition, J.E. testified that in February 2003 she was suspended for engaging in a verbal and physical altercation with Renee in the school hallway where punches were thrown. (*Id.*) During that brawl, security guard Wayne Alan required J.E.'s brother S.E.'s assistance to break up the fight by "grabbing" J.E. and "throw[ing]" her in a room. (*Id.*)

**17.** At this deposition, plaintiff S.E. testified as follows:

Q. You're trying to pull J.E. out of the situation?

A. Me and Tom Kretsos, the security guard—I'm breaking it away. Tom comes in and tries to break it up but he couldn't.

Q. As you're trying to pull J.E. away, Tom comes in and tries to break up the fight, but he can't. Why not?

A. I don't know. As he was coming to break it up, he was getting frustrated. I seen [sic] it in his face. He was getting frustrated.

Q. Why was he getting frustrated?

A. Because he couldn't break up the fight.

　\* \* \* \* \*

Q. So he is in between—he put himself in between your sister and [R.W.] and he is trying to pull [R.W.] out of the situation?

A. Yes.

Q. What happens next?

A. He know [sic] he couldn't do it. So I guess he went crazy and actually swang [sic] at my sister.

(*Id.* at Ex. I at 69, 71–72.)

deposition confirms that he and Kretsos were attempting to separate J.E. and R.W., but Kretsos "was getting frustrated" because the brawl was escalating and he could not stop the fight. It was in this context, while Kretsos is actually lodged between R.W. and J.E. that he swung around and hit J.E. once in the face. By S.E.'s own account, as soon as J.E. was hit he was planning to physically retaliate against Kretsos when both he and C.E. "went towards" Kretsos. (*Brewington Decl.*, Ex. K at 85–86.) As she approached, C.E. demanded to know why Kretsos hit her sister. It was at this point that Kretsos is claimed to have punched C.E. once. C.E. and S.E. then each followed through and punched Kretsos. (*Id.*) Kretsos thereafter was allegedly "out of control" and elicited racial epithets at the infant plaintiffs. Defendants Bracco and Trocchio intervened, restrained him and had him taken injured to the girl's bathroom.

While Kretsos' alleged use of force against J.E. and C.E. was undeniably wrong, in view of the riotous circumstances of this case and Kretsos' attempts to intervene in the students' altercation, Kretsos' conduct falls short of the threshold for establishing a constitutional claim. The level of force used against J.E. and C.E. was not nearly as extreme or as violent as that used intentionally by the gym teacher in *Johnson* and is closer in the continuum to the unprovoked conduct in *Smith*. Although plaintiffs assert they suffered psychological and physical injuries, there is simply no evidence that Kretsos applied force maliciously or sadistically to either J.E. or C.E. Rather the evidence demonstrates that his aim was to contain a fight between students, which was spinning out of control and in danger of expanding to other students. In short, within the context of this incident, the wrong perpetrated by Kretsos fails to rise

to a constitutional violation of the infant plaintiffs' substantive due process.

In addition, plaintiffs' have not established a cognizable substantive due process claim that defendants deprived them of their liberty interest in freedom from unjustified intrusions on personal security based upon the racial comments Kretsos allegedly made on April 4, 2003. There is no question that in a civilized society, it is reprehensible for anyone to utter a racial slur against another individual. That being said, the alleged racial slurs were made during the riotous incident which was perpetrated by the students and in which Kretsos had unsuccessfully attempted to contain, but had lost control. In the heat of the moment, individuals do make regrettable statements which in a perfect world should never be uttered. Given the attendant circumstances of this case, the statements made by Kretsos do not rise to the level required to support a constitutional violation of the infant plaintiffs' substantive due process.

In turn, having concluded that Kretsos' conduct does not support a substantive due process claim, plaintiffs' claims regarding the defendants' failure to intervene to stop Kretsos likewise fails to rise to constitutional proportions.

To the extent that plaintiffs claim the defendants violated their substantive due process rights by failing to protect them from other students, this claim fails. In general, the Due Process Clause "does not require that the states protect the life, liberty, and property of its citizens against invasion by private actors." *K.W. v. City of New York*, 275 F.R.D. 393, 397 (E.D.N.Y.2011) (internal quotation marks and citations omitted); *see DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 196, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989) (explaining the purpose

of the Due Process Clause "was to protect the people from the State, not to ensure that the State protected them from each other"). "The Due Process Clause protects citizens from being deprived by the state of those rights, but it does not require the state to provide aid, even when it may be necessary." *Id.* (internal quotation marks and citations omitted). "[S]chools have no duty under the Due Process Clause to protect students from assaults by other students, even where the school knew or should have known of the danger presented." *Patenaude v. Salmon River Cent. Sch. Dist.*, No. 03–CV–1016, 2005 WL 6152380, at *11 (N.D.N.Y. Feb. 16, 2005); *see Scruggs v. Meriden Bd. of Educ.*, No. 03–Civ–2224, 2007 WL 2318851, at *12–13 (D.Conn. Aug. 10, 2007) (school officials' alleged failure to remedy students bullying and harassment of plaintiff was insufficient to support substantive due process claim where there was no evidence that the officials encouraged or affirmatively permitted the harassment).

 Plaintiffs' claim that defendants violated C.E.'s substantive due process rights by "attempting to force her back to attend school" is unavailing because this claim is raised for the first time in plaintiffs' opposition to defendants' summary judgment motions. *See Lyman v. CSX Transp., Inc.*, 364 Fed.Appx. 699, 701–02 (2d Cir.2010) (affirming the district court's holding that it should not consider claims raised for the first time in plaintiff's opposition to summary judgment); *Greenidge v. Allstate Ins. Co.*, 446 F.3d 356, 361 (2d Cir.2006); *see also Casseus v. Verizon New York, Inc.*, 722 F.Supp.2d 326, 344 (E.D.N.Y.2010) (same); *Brandon v. City of New York*, 705 F.Supp.2d 261, 278 (S.D.N.Y.2010) ("It is black letter law that a party may not raise new claims for the first time in opposition to summary judgment").

 Finally, to the extent plaintiff Victoria claims that defendants violated her own substantive due process rights by filing a PINS petition and making a report to Child Protective Services to have C.E. returned to school this claim is meritless. Victoria Edwards' entire basis for this cause of action is that defendants' actions in filing the petition and report[18] were an effort to circumvent her parental rights and make her force her daughter back to school in an unsafe environment. (Pls. Mem. of Law in Opp. to District Defs. Mtn. at 27.) There is no support in this Circuit, nor do plaintiffs provide the court with any support, for a liberty interest on behalf of a parent to dictate the educational environment of a child of compulsory education age or a constitutional parental right not to be forced to place such child in a school environment that the parent subjectively perceives to be unsafe. Thus, plaintiff Victoria is unable to assert a substantive due process violation on this basis.

---

18. Considering the context within which the petition and report were filed, plaintiff Victoria fails to establish any violation of her substantive due process. It is undisputed that plaintiff C.E.'s suspension expired on October 31, 2003 and that she was due to return to school on Monday, November 3, 2003. (*Stern Decl.*, Exs. KK at 39; SS.) By letter dated November 18, 2003, plaintiff Victoria was informed that C.E. was of compulsory education age and "[i]f C.E. continues her pattern of nonattendance, the District will have no choice but to file a PINS petition with Family Court." (*Id.* at Ex. SS.) On January 21, 2004, when C.E. had not returned to school, the District filed a PINS petition in Family Court. (*Id.* at Ex. CCC.) Victoria acknowledged at her deposition that the PINS petition was filed because the District wanted her to "send C.E. back to Center Moriches School." (*Id.* at Ex. M at 254.) There is no evidence in the record that defendants filed false information in the report or petition, that the reports resulted in some adverse proceedings or that Victoria suffered any resulting harm to a legally protected interest.

Accordingly, the undersigned recommends that the District Defendants' and defendant Kretsos' motions for summary judgment on plaintiffs' substantive due process claims be granted.

### B. Procedural Due Process

 The plaintiffs allege a violation of their rights under the Due Process clause of the Fourteenth Amendment. "The Due Process Clause does not protect against all deprivations of constitutionally protected interests in life, liberty, or property, only against deprivations without due process of law." *Rivera–Powell v. New York City Bd. of Elections*, 470 F.3d 458, 464 (2d Cir.2006) (internal quotation marks and citation omitted). "To determine whether a constitutional violation has occurred, it is necessary to ask what process the State provided, and whether it was constitutionally adequate." *Id.* at 465 (internal quotation marks and citation omitted). Thus, "[i]n order to assert a violation of procedural due process rights, a plaintiff must first identify a property right, second show that the [government] has deprived him of that right, and third show that the deprivation was effected without due process." *Rivera v. Town of Huntington Housing Auth.*, No. 12–CV–901 (DRH)(ARL), 2012 WL 1933767, at *4 (E.D.N.Y. May 29, 2012) (internal quotation marks and citations omitted) (alteration in original).

 New York State's Constitution and education laws provide "a right to a free public education for individuals under the age of twenty-one" which is protected by the Due Process Clause of the Fourteenth Amendment. *Lopez v. Bay Shore Union Free School Dist.*, 668 F.Supp.2d 406, 419 (E.D.N.Y.2009) (citation omitted). Each of the infant plaintiffs were suspended from school, and their suspensions constitute a deprivation of their constitutionally protected right to a public education. *See Goss v. Lopez*, 419 U.S. 565, 576, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975). Thus, the court examines whether the infant plaintiffs were deprived of their right to a public education without due process. *See id.* at 574, 95 S.Ct. 729 ("The authority possessed by the State to prescribe and enforce standards of conduct in its schools although concededly very broad, must be exercised consistently with constitutional safeguards. Among other things, the State is constrained to recognize a student's legitimate entitlement to a public education as a property interest which is protected by the Due Process Clause and which may not be taken away for misconduct without adherence to the minimum procedures required by that Clause.").

### 1. Disciplinary Hearing

 "Once it is determined that due process applies, the question remains what process is due." *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). The Supreme Court has held that "[a]t the very minimum, ... students facing suspension and the consequent interference with a protected property interest must be given some kind of notice and afforded some kind of hearing." *Goss*, 419 U.S. at 579, 95 S.Ct. 729. "As a general matter, due process of law at a school disciplinary hearing need not include all of the procedural protections provided in a criminal proceeding. Rather, the trier of fact in a school disciplinary setting need provide only minimal due process for mild penalties, but must provide more significant protections for severe penalties." *Lopez*, 668 F.Supp.2d at 419 (internal quotation marks and citations omitted). Where, as here, long-term suspensions were at issue, greater process

was required.[19] *Id.; see, e.g., Barnett v. Tipton County Bd. of Educ.,* 601 F.Supp.2d 980, 985 (W.D.Tenn.2009) ("A student's right to procedural due process requires formal procedures for student disciplinary hearings involving expulsion or suspensions of more than ten days. School officials must tailor disciplinary hearing procedures to avoid 'unfair or mistaken findings of misconduct and arbitrary exclusions from school.' School board disciplinary hearings satisfy due process when the student is given the opportunity to refute and explain the allegations against him") (quoting *Goss,* 419 U.S. at 581, 95 S.Ct. 729); *accord DeFabio v. East Hampton Union Free Sch. Dist.,* 658 F.Supp.2d 461, 489 (E.D.N.Y.2009), *aff'd* 623 F.3d 71 (2d Cir.2010) (same).

The undisputed facts of the instant case demonstrate that the process afforded to each of the infant plaintiffs was sufficient to satisfy the constitutional requirements of due process. First, plaintiffs had timely notice of the disciplinary hearings against them. By letters dated April 10, 2003, the District notified the plaintiffs of the specific charges against them and advised them that the Superintendent's Hearings were scheduled to commence on April 14, 2003. (*Stern Decl.,* Ex. FF.) Moreover, the disciplinary hearings took place over the course of five days between April and May 2003, at plaintiffs' request were held simultaneously, and at the hearing, plaintiffs had counsel who presented their version of the facts. (*Id.*

at Exs. KK at 1; E.) Dr. Bert Nelson, an independent hearing officer with many years of experience in education including 16 years as a Superintendent of Schools, was retained to preside over the hearing. (*Id.* at Ex. N at 82–83; S at 12–14.) Plaintiffs' counsel made opening statements and closing arguments, was permitted to present witnesses and evidence, and had an opportunity to and did in fact cross-examine witnesses during the hearing. (*Id.* at Ex. E; Pls. Counter 56.1 Stmt. ¶¶ 270, 272.) Each of the infant plaintiffs testified at the hearing, and Dr. Nelson heard sworn testimony from defendants Bracco, Cruz, Trocchio, Treadwell, security guards Greg Gates, Joseph Townsend, Middle School Principal Matthew LeStrange, School Nurse Robin Gross, Custodian Otis Payne, English Teacher Sherry Turano, Social Worker Eliana Ward, School Psychologist Anna Aiello, Robin Hughes, two high school students, a middle school student, and four parents of students. (*Id.* at Ex. E; Pls. Counter 56.1 Stmt. ¶¶ 288.) Finally, following the hearings, Dr. Nelson issued a 40–page Hearing Officer's Report of his findings of fact and recommendations, which Dr. Cicero adopted. (*Id.* at Exs. KK; N at 85, 91–95.) By letters dated May 27, 2003, the plaintiffs were informed of Dr. Cicero's decision and of their right to appeal to the Board of Education. (*Id.* at Ex. LL.) Plaintiffs did not appeal to the Board of Education, but instead appealed to the New York State Education Department. (*Id.* at Ex. PP.) The appeal was denied. (*Id.*)

19. New York State law provides certain procedural protection for students facing suspensions of more than five days:

No pupil may be suspended for a period in excess of five school days unless such pupil and the person in parental relation to such pupil shall have had an opportunity for a fair hearing, upon reasonable notice, at which such pupil shall have the right of representation by counsel, with the right

to question witnesses against such pupil and to present witnesses and other evidence on his behalf. Where a pupil has been suspended in accordance with this subdivision by a superintendent of schools, ... the superintendent shall personally hear and determine the proceeding or may, in his discretion, designate a hearing officer to conduct the hearing. N.Y. Educ. L. § 3214.

Given the infant plaintiffs were provided with (i) timely notice of the pending charges against them, (ii) a full opportunity to present their case at a formal disciplinary hearing prior to the decision to suspend each of them, (iii) the ability to challenge that suspension on appeal, and plaintiffs did in fact appeal the decision, the undersigned concludes that the procedures afforded the Edwards children in connection with their suspensions satisfied the plaintiffs' procedural due process under the Constitution. *See, e.g., DeFabio,* 658 F.Supp.2d at 491 (granting summary judgment on due process claim where District sent timely letter notifying the student of charges, held hearing before the superintendent at which student had counsel who presented the student's version of the events and questioned complaining witnesses, and where the student was entitled to challenge the long term suspension); *Bogle–Assegai v. Bloomfield Bd. of Educ.,* 467 F.Supp.2d 236, 243 (D.Conn.2006) (granting summary judgment on due process claim based on a 180–day suspension where students were provided notice of the expulsion hearing, were represented by counsel and presented opening arguments, summations, and evidence and cross examined witnesses); *Rosa R. v. Connelly,* 889 F.2d 435, 438–39 (2d Cir.1989) (affirming grant of summary judgment on due process claim based on 180–day suspension where student and his mother were provided notice, an "ample opportunity to present their views" at the hearing and had "recourse to appeal the Board's decision to the state board of education before the allegedly unconstitutional deprivation took effect"); *Cohn v. New Paltz Cent. Sch. Dist.,* 363 F.Supp.2d 421, 433 (N.D.N.Y.2005) (dismissing due process claim on 180–day suspension where student received notice of charges, a disciplinary hearing was held and student utilized the appellate procedures that were available), *aff'd in part and dismissed in part on other grounds,* 204 Fed.Appx. 56 (2d Cir.2006) (summary order).

■ Although in their opposition papers the infant plaintiffs assert various arguments that the process afforded at the hearings and in connection with tutoring services was insufficient the undersigned finds these arguments unpersuasive. First, plaintiffs challenge various evidentiary rulings made by Dr. Nelson during the hearing, viz. allowing hearsay evidence from unidentified witnesses, allowing characterizations of events by witnesses who had no personal knowledge, permitting leading questions, and prohibiting plaintiffs' counsel from using a document that defense counsel used to refresh a witness' recollection to impeach a witness. While "[p]ublic high school students do have ... procedural rights while at school, ... § 1983 does not extend the right to relitigate in federal court evidentiary questions arising in school disciplinary proceedings." *Wood v. Strickland,* 420 U.S. 308, 326, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975); *see also United States v. International Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL–CIO,* 941 F.2d 1292, 1298 (2d Cir.1991) ("procedural due process does not require rigid adherence to technical evidentiary rules in administrative hearings, as long as the evidence introduced is reliable").

■ Next, plaintiffs aver in a single sentence without any explanation that Dr. Nelson violated plaintiffs' due process rights during the hearing by failing to allow plaintiffs' then counsel to cross-examine all witness testimony. (Pls. Mem. in Opp. to District Defs. Mtn. at 21.) "As a general matter, there is no hard and fast federal Constitutional right to call or cross-examine witnesses in a school disciplinary setting." *Lopez,* 668 F.Supp.2d at

422. That being said, plaintiffs stated that "Plaintiffs' Counsel had an opportunity to and did cross-examine witnesses during [the] hearings," and therefore plaintiffs were given the opportunity to confront adverse witnesses. (*See* Pls. Counter 56.1 Stmts. ¶¶ 270, 272.) Plaintiffs' lone sentence in their opposition papers to the contrary or with respect to "all" witnesses, without more, is insufficient to raise a procedural due process violation.

■ Finally, plaintiffs' argument that Dr. Nelson violated their procedural due process rights because he "ignored nonparty eyewitness testimony ... [that] Kretsos call[ed] [p]laintiffs "Niggers," and "disregarded" witnesses who saw Kretsos swing at [J.E.] likewise fails. (Pls. Mem. in Opp. to District Defs. Mtn. at 22.) Dr. Nelson's report addressed the fact that he received "considerable testimony ... regarding the role of Security Guard Tom Kretsos in relationship to the actions of [S.E.], [J.E.], and others," but was unable to conclude with certainty what transpired with respect to Kretsos' behavior. (*Stern Decl.*, KK at 30.) Dr. Nelson concluded that, in any event, in his judgment the disciplinary hearing decision required that he focus on the actions and conduct of the students involved:

> The actions and language of the single security guard is reported by all to have taken place in the latter phase of events of April 4, 2003.... Without having been there and having heard firsthand, it is impossible to know with absolute certainty what, if anything was said. In fact, however, whatever the actual words spoken by Security Guard Kretsos, the actual behavior, conduct and actions of the students involved as the respondents in this hearing is what matters. That behavior may have occurred within the context of works spoken by the security guard, but those words—as terrible as

they may have been—do not justify, explain, nor excuse the physical actions of the students.

(*Id.* at 30–32.) "It is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking in wisdom or compassion." *Wood,* 420 U.S. at 327, 95 S.Ct. 992. Section 1983 does not extend the right to relitigate in federal court the "discretion and judgment" made by school administers in their decisions during school disciplinary proceedings. *Id.* ("The system of public education that has evolved in this Nation relies necessarily upon the discretion and judgment of school administrators and school board members, and § 1983 was not intended to be a vehicle for federal court correction of errors in the exercise of that discretion, which do not rise to the level of violations of specific constitutional guarantees."); *see Davis,* 526 U.S. at 648, 119 S.Ct. 1661 (courts must "refrain from second-guessing the disciplinary decision made by school administrators"); *see also Saggio v. Sprady,* 475 F.Supp.2d 203, 211 (E.D.N.Y.2007) ("the court must give substantial deference to school administrator's determinations").

#### 2. Tutoring Services

Plaintiffs assert that (a) during the infant plaintiffs' periods of suspensions defendants violated their procedural due process by failing to provide adequate tutoring services; and (b) defendants violated plaintiff C.E. of a right to education by refusing to provide tutoring services for her after November 2003, when her suspension from school expired.

■ When reviewing alleged procedural due process violations, the Supreme Court has distinguished between (1) claims based on established state procedures and (2) claims based on random, unauthorized acts by state employees. *See Hudson v.*

*Palmer,* 468 U.S. 517, 532, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984); *Hellenic Am. Neighborhood Action Committee v. City of New York,* 101 F.3d 877, 881–82 (2d Cir. 1996). Where the alleged deprivation is based on random, unauthorized acts, the Due Process Clause of the Fourteenth Amendment is not violated when a state employee intentionally deprives an individual of liberty, "so long as the state provides a meaningful postdeprivation remedy." *Hellenic Am. Neighborhood Action Committee,* 101 F.3d at 880. Plaintiffs make no claim that the due process violation here was caused by an established state procedure. Rather, the plaintiffs' claimed deprivation of a protected property interest appears to have occurred in connection with alleged random and arbitrary acts of the tutors who were provided to plaintiffs by the District.

■ It is undisputed that the District provided tutoring services for each of the infant plaintiffs during the period of their suspensions. Plaintiffs claim, however, that the tutoring was inadequate because it was "inconsistent and substandard, for example, [p]laintiffs could not understand two of the tutors, one tutor was at least two hours late for a tutoring session and [d]efendants controlled the scheduled [sic] the tutors without input from [p]laintiff Victoria other than for her to make arrangements for a place for the tutoring." (Pls. Mem. in Opp. to District Defs. Mtn. at 22.) The record indicates that plaintiff Victoria challenged the adequacy of the tutoring services provided to her children with the New York State Education Department. (*Stern Decl.,* Ex. PP.) In a decision dated November 19, 2003, the Commissioner of

the New York State Education Department stated:

> Petitioner offers no evidence to support her allegation of inadequate tutoring. Respondent on the other hand, asserts that each student is receiving two hours of tutoring per day and that the children's teachers have provided curriculum materials to ensure the alternative instruction is substantially equivalent to what they would receive in class. Previous Commissioner's decisions have found that two hours of alternative instruction fulfill a district's obligation under the Education Law. Although petitioner initially rejected many of the scheduling options offered by the tutor, the hearing examiner facilitated an agreement between petitioner and respondent on a schedule for instruction. Accordingly, I find that petitioner has failed to meet her burden of proving that the alternative instruction provided by respondent is inadequate.

(*Id.* at 1315–16.) Inasmuch as there was an adequate state post-deprivation procedure [20] to remedy plaintiffs' alleged deprivation of property, it cannot be said that the plaintiffs were deprived of a property interest without due process of law. *See Hellenic Am. Neighborhood Action Committee,* 101 F.3d at 881–82 ("[T]here is no constitutional violation (and no available § 1983 action) when there is an adequate state post-deprivation procedure to remedy a random, arbitrary deprivation of property or liberty.")

Plaintiff C.E.'s claim of a deprivation of due process with respect to the District's failure to provide her tutoring following the conclusion of her suspension likewise fails. The record is clear that Victoria

---

**20.** In addition, following the dismissal of the Commissioner of Education's decision, plaintiffs could have commenced an Article 78 proceeding, used to review administrative decisions including those of the Commissioner of Education. *Cf. Federico v. Board of Educ. of Pub. Schs. of Tarrytowns,* 955 F.Supp. 194, 202 (S.D.N.Y.1997).

Edwards received notification in writing that the home instruction for C.E. would end upon the expiration of C.E.'s suspension from school. (*Brewington Decl.*, Ex. M at 250.) C.E.'s suspension from school expired on October 31, 2003. By state law, C.E. was required to return to school on Monday, November 3, 2003. Plaintiff Victoria refused to allow her daughter C.E. to return to school. Although Victoria requested continued home instruction, that request was denied. By letter dated November 10, 2003, counsel for the District assured plaintiffs that Center Moriches provided a safe learning environment and that unless C.E. could identify with specificity what or whom she fears, the school would have to deny her request. (*Stern Decl.*, Ex. RR.) Additional follow-up letters and telephone calls were made by the District to Victoria (and her counsel) regarding C.E.'s return to the Middle School, including a proposal by the Superintendent to allow C.E. to return to school on a modified schedule to ease her back to the school, which C.E.'s mother rejected. (*Id.* at Exs. SS, TT.) In short, plaintiffs have failed to provide any support that would demonstrate a constitutionally protected interest in the right to continued tutoring services under these circumstances, or that C.E. was deprived of any process in this regard.

Accordingly, the undersigned recommends that the district court grant the District Defendants' and defendant Kretsos' motion for summary judgment on the plaintiffs' procedural due process claims.

## C. Equal Protection

■ The Equal Protection Clause of the Fourteenth Amendment provides that no state shall "deny to any persons within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. It is "essentially a direction that all persons similarly situated be treated alike." *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985); *see Sound Aircraft Servs., Inc. v. Town of East Hampton*, 192 F.3d 329, 335 (2d Cir.1999) ("[a]t its core, equal protection prohibits the government from treating similarly situated persons differently"). "To state a claim for an equal protection violation, plaintiffs must allege that a government actor intentionally discriminated against them on the basis of race, national origin or gender." *Hayden v. County of Nassau*, 180 F.3d 42, 48 (2d Cir.1999). Here, the crux of plaintiffs' allegations against the District Defendants and defendant Kretsos is a claim of selective enforcement based on impermissible race and national origin considerations.

■ It is well-settled that to establish an equal protection violation on a claim of selective enforcement, the plaintiff must satisfy a two-prong test and prove that "(1) the plaintiff, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Brown v. City of Syracuse*, 673 F.3d 141, 151–52 (2d Cir.2012) (internal quotation marks and citations omitted); *see Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 790 (2d Cir.2007); *Seymour's Boatyard, Inc. v. Town of Huntington*, No. 08–CV–3248(JG)(AKT), 2009 WL 1514610, at *7 (E.D.N.Y. June 1, 2009). Under the first prong, plaintiffs must demonstrate that they were "treated differently from other similarly situated [individuals]." *Cine SK8, Inc.*, 507 F.3d at 790; *see Church of the Am. Knights of the KKK v. Kerik*, 356 F.3d 197, 210 (2d Cir.2004) (same). "In particular, at the summary judgment stage, a plaintiff must present

evidence comparing herself to individuals that are similarly situated in all material respects." *Vassallo v. Lando*, 591 F.Supp.2d 172, 184 (E.D.N.Y.2008) (internal quotation marks and citations omitted); *see Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir.2009).

■■■■■ "[W]hen a plaintiff attempts to prove selective enforcement on the basis of his race, he must show that similarly situated individuals of a different race were not [subjected to the offensive conduct]." *Id.* Although determining whether parties are similarly situated is typically "a fact-intensive inquiry," *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 n. 2 (2d Cir.2001), "[a] court may grant summary judgment in a defendant's favor on the basis of lack of similarity of situation ... where no reasonable jury could find that the persons to whom the plaintiff compares [him]self are similarly situated," *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir.2006); *accord Vassallo*, 591 F.Supp.2d at 184 (same). Under the second prong, plaintiffs must demonstrate that "the disparate treatment was caused by the impermissible motivation. They cannot merely rest on a showing of disparate treatment." *Bizzarro v. Miranda*, 394 F.3d 82, 87 (2d Cir.2005) *see Anderson v. City of New York*, 817 F.Supp.2d 77, 94–95 (E.D.N.Y.2011) (same). The court will address plaintiffs selective enforcement claims against the District Defendants and defendant Kretsos separately.

## 1. Equal Protection Claims Against the District Defendants

■■■■ Plaintiffs claim that the District Defendants violated their rights to equal protection by selective enforcement of discipline practices and policies based on impermissible race and national origin considerations.[21] Specifically, plaintiffs assert that they were disciplined disparately from similarly situated Caucasian students as a result of their conduct during the incident on April 4, 2003, because defendants considered their prior disciplinary histories, but did not consider the prior disciplinary histories of Caucasian students, in imposing discipline. Upon reviewing the record evidence in the light most favorable to plaintiffs and drawing all inferences in their favor, the undersigned concludes that plaintiffs have failed to satisfy the first prong element of a selective enforcement claim to raise a genuine issue of material fact over whether the infant plaintiffs were similarly situated to any Caucasian students or any other students involved in the incident.

First, in their opposition papers, apart from R.W., plaintiffs do not identify any similarly situated students who were treated more favorably than plaintiffs in connection with the April 4, 2003 incident. With respect to R.W., no rational jury could find that she was similarly situated for purposes of comparison of selective treatment. R.W. is African–American, was suspended for over six months for her participation in the melee, but, unlike J.E.,

**21.** The District Defendants seek summary judgment with respect to the infant plaintiffs' equal protection claims based on alleged violations in connection with the April 4, 2003 incident and the provision of tutoring services. In their opposition papers, plaintiffs failed to address or respond to any of defendants' arguments regarding these claims. The undersigned therefore deems these claims abandoned and recommends that the district court grant summary judgment in favor of the District Defendant with respect to these claims. *See Taylor v. City of New York*, 269 F.Supp.2d 68, 75 (E.D.N.Y.2003); *Santiago v. City of New York*, No. 05–CV–3668 (RRM)(VVP), 2009 WL 935720, at *11 n. 19 (E.D.N.Y. Mar. 31, 2009); *Sorto–Romero v. Delta Int'l Machinery Corp.*, No. 05–CV–5172 (SJF)(AKT), 2007 WL 2816191, at *9 (E.D.N.Y. Sept. 24, 2007).

C.E. or C.E. Jr., she was not found to have assaulted a security guard, nor did she have the extensive prior history of misconduct of J.E. or C.E. To the extent plaintiffs seek to compare themselves to R.W. based on the facts that (i) R.W. was not of Native American national origin or (ii) that their discipline was excessive compared to her, the additional fact that R.W. was suspended for a longer period of time than C.E. Jr. (for two months) or C.E. (for six months) undermines the comparison for purposes of their selective enforcement claim.

 Next, there is no evidence that any of the students involved in the in the April 4, 2003 incident were treated differently than the infant plaintiffs or that the charges brought against them were discriminatory. The charges made against the infant plaintiffs and others were a direct result of those students' involvement during the riot. Not only were plaintiffs charged, but so were other students charged and suspended from school, including R.W. (African American but not Native American), J.W. (same), and S.A. (African American, Native American). (*Stern Decl.*, Exs. V at 46, 175, 240; W at 21; Q at 92.)

Further, in response to defendants' First Set of Interrogatories to "Identify by name every individual whom you claim was similarly situated to you but given preferential treatment," plaintiffs identified only R.W., J.W., J.M. and K.A., all of whom are African American. (*Id.* at Exs. ZZ, Nos. 7, 23; G at 14; K at 20–21; I at 32; H at 43; Q at 92; O at 20; P at 46–47.)

Finally, plaintiffs reliance on the United States Department of Education, Office of Civil Rights ("OCR") investigation [22] report in which the OCR utilized statistical computations to show a purported disparate impact on African–American and Native–American students in certain levels of discipline at the High School during the 2002–2003 school year (the "OCR Report") to establish that plaintiffs were subjected to disparate treatment as compared to Caucasian students is misplaced. To satisfy the "similarly situated" prong, plaintiffs must provide evidence comparing themselves to individuals that are similarly situated in all material respects; that is to say they must show a comparison of a similarly situated student of a different race or national origin who was involved in a fight and/or riot and/or physical altercation with a security guard and who was more favorably treated that the infant plaintiffs. Plaintiffs cannot proffer statistics in the OCR Report to establish the existence of this element to support their claim of a violation of equal protection, viz. that they were treated disparately in this case.[23] *Cf. United States v. Armstrong,* 517 U.S. 456, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996) (study showing that persons selectively prosecuted for crack cocaine trafficking

---

**22.** The OCR specifically investigated the plaintiffs' disparate treatment claim and by letter dated July 17, 2003 advised plaintiff Victoria Edwards that because there was no evidence to support their allegation that plaintiffs were treated differently than Caucasian students with respect to the imposition of discipline, the OCR would not take further action regarding that allegation. (*Stern Decl.,* Ex. MM.)

**23.** Notably, the OCR Report's findings make no reference to Superintendent Hearings or discipline resulting from such hearings, and there is no indication in the Report that OCR had examined discipline resulting from Superintendent Hearings and/or whether disciplinary histories had been considered in such hearings. (*Brewington Decl.,* Ex. LL.) *Cf. Armstrong,* 517 U.S. at 470, 116 S.Ct. 1480; *United States v. Bass,* 536 U.S. 862, 863–64, 122 S.Ct. 2389, 153 L.Ed.2d 769 (2002) ("raw statistics regarding overall charges say nothing about charges brought against *similarly situated defendants"*) (emphasis in original).

were black "did not constitute evidence tending to show the existence of the essential elements of a selective prosecution claim" to support a violation of equal protection).

In sum, because plaintiffs have failed to provide any evidentiary support that others, similarly situated, were treated differently from plaintiffs, no reasonable juror could find that the plaintiffs' burden was met. Such an omission is fatal to plaintiffs' equal protection claim against the District Defendants. *Clubside, Inc.*, 468 F.3d at 159; *see Vassallo*, 591 F.Supp.2d at 184 (holding a court may dismiss a selective enforcement claim on summary judgment when it is clear that no reasonable jury could find the similarly situated prong met). Accordingly, the undersigned recommends that the District Defendants' summary judgment motion on plaintiffs' equal protection claim be granted.

## 2. Equal Protection Claims Against Defendant Kretsos

 The infant plaintiffs assert that defendant Kretsos violated their equal protection rights by selective treatment in dealing with the hostility between the students during the April 4, 2001 altercation when he physically assaulted J.E. and C.E. and yelled racial epithets at them. However, plaintiffs have failed to set forth evidence that others, similarly situated, were treated differently from plaintiffs or that defendant Kretsos discriminated against the infant plaintiffs based on their race or national origin.

In the Complaint, plaintiffs aver that they "had/have a constitutionally protected right to equal protection of the laws and to enjoy equal privileges and rights as afforded to white persons, pursuant to the Equal Protection Clause of Amendment XIV of the United States Constitution." (Compl. ¶ 82.) Plaintiffs have not, however, identified a single similarly situated Caucasian

student. Rather, plaintiffs proffer the OCR Report as evidence of a "systematic disparate treatment of black and Native American students by the staff at co-Defendant School District, for which Defendant Kretsos was a staff member." As stated *supra*, plaintiffs cannot proffer the statistics in the OCR Report to establish the existence of the essential elements specific to their own claim of selective enforcement against Kretsos. *Cf. Armstrong*, 517 U.S. at 470, 116 S.Ct. 1480; *Bass*, 536 U.S. at 863–64, 122 S.Ct. 2389.

During the April 4, 2003 incident, the two groups of students involved in the fights were African–American. Plaintiffs' argue that defendant Kretsos violated the infant plaintiffs' equal protection rights when he allegedly used racial epithets, to wit, called C.E. a "nigger bitch"; and yelled at the students, "I called the police and you bunch of niggers are getting fucking arrested." Assuming arguendo that Kretsos made these statements, plaintiffs provide no evidence that Kretsos treated any other students differently during the altercation, as both groups of students were African–American, or during any other riots at the High School. Plaintiffs assertion that because Kretsos was never previously disciplined, he must have never used profanity when dealing with Caucasian students is pure conjecture and speculation and fails to raise a genuine issue of material fact that the infant plaintiffs were treated differently than others similarly situated. *See Rivera–Powell v. New York City Bd. of Elections*, 470 F.3d 458, 470 (2d Cir.2006) (conclusory allegations are insufficient to establish discrimination).

 Finally, to the extent plaintiffs seek to compare themselves to R.W. and "several other non-Native American students" to assert selective treatment by defendant Kretsos based on national origin in how he dealt with the hostility between

the two groups of students during the melee, there is simply no evidence that Kretsos' response to J.E. or C.E. was based on the fact that they were African–American, Native American. As the testimony of defendant C.E. Jr. (and C.E.) made clear, defendant Kretsos was trying to "break up everything." The generalized, conclusory testimony from three witnesses that "the District's security guards at the High School targeted Native American students for harsh treatment based on their national origin," (Pls. Mem. in Opp. to Def. Kretsos' Mtn. at 14), without more, is insufficient to establish a discriminatory purpose in this instance by security guard Kretsos to hit J.E. and C.E. during the April 4, 2004 brawl based on their national origin. *See Karlen v. Westport Bd. of Educ.*, 2010 WL 3925961, at *10 (D.Conn. Sept. 30, 2010) (plaintiffs alleging discrimination in violation of the Equal Protection Clause "must show intentional discrimination rather than mere discriminatory effect"); *see also Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) (discriminatory purpose must be at least a "motivating factor" in the decision, even if not the primary consideration); *Saggio v. Sprady*, 475 F.Supp.2d 203, 209 (E.D.N.Y.2007) (dismissing equal protection claim where there was insufficient evidence to support a conclusion that race played a role in the determination of how to deal with hostility between students). Plaintiffs' assumption that because J.E. and C.E. were of different national origin from R.W. and others, an inference can be made that Kretsos' actions were made against them were because they were Native American is unavailing. *See Grillo v. New York City Transit Auth.*, 291 F.3d 231, 235 (2d Cir.2002) (affirming summary judgment where plaintiff did "little more than cite to [his alleged] mistreatment and ask the court to conclude that it must have

been related to [his] race. This is not sufficient").

In sum, because no reasonable jury could find that defendant Kretsos treated plaintiffs differently on the basis of their race and national origin, plaintiffs' equal protection claim against defendant Kretsos fails. Accordingly, the undersigned recommends that the defendant Kretsos' summary judgment motion on plaintiffs' equal protection claim be granted.

**D. First Amendment Retaliation Claim**

Plaintiff Victoria Edwards alleges that defendants infringed on her right to free speech pursuant to the First Amendment by retaliating against her for having filed a Notice of Claim and discrimination complaint against the District. Specifically she avers that defendants retaliated by (i) denying the infant plaintiffs adequate tutoring throughout 2003–2004; and (ii) by filing a PINS petition making a false report to Child Protective Services to force plaintiff C.E. back to the High School.

■ A plaintiff alleging a violation of her First Amendment rights must demonstrate "(1) [s]he has an interest protected by the First Amendment; (2) defendants' actions were motivated or substantially caused by [her] exercise of that right; and (3) defendants' actions effectively chilled the exercise of [her] First Amendment right." *Curley v. Village of Suffern*, 268 F.3d 65, 73 (2d Cir.2001) (citation omitted); *see also Zherka v. Amicone*, 634 F.3d 642, 644–45 (2d Cir.2011); *Locurto v. Safir*, 264 F.3d 154, 166 (2d Cir.2001); *Glacken v. Inc. Village of Freeport*, No. 09 CV 4832(DRH)(AKT), 2012 WL 894412, at *7 (E.D.N.Y. Mar. 15, 2012).

■ There is no dispute here that, by filing a Notice of Claim or a complaint of discrimination related to race and national

origin concerning her children's education in the Center Moriches schools, plaintiff Victoria engaged in protected activity. *See Karlen v. Westport Bd. of Educ.*, No. 07–CV–309 (CFD), 2010 WL 3925961, at *17 (D.Conn. Sept. 30, 2010). What is missing here, however, is evidence of unlawful retaliation by defendants which was motivated by plaintiff Victoria's exercise of her speech. As an initial matter, as discussed *supra,* there is no evidence that defendants provided inadequate tutoring services to plaintiff Victoria's children and therefore this act cannot provide a basis for her First Amendment retaliation claim.

■ With respect to the filing of the PINS petition and making a report to Child Protective Services to have plaintiff C.E. returned to school, plaintiff Victoria has set forth no facts to suggest that defendants' actions were made for anything but lawful reasons. The record shows that plaintiff C.E.'s suspension expired on October 31, 2003. As previously noted, plaintiff Victoria was advised by the District that C.E. was of compulsory education age and that if C.E. continued to be unlawfully absent from attendance the District would have no choice but to file a PINS petition in Family Court, as C.E. would then be considered a "person in need of supervision." [24] On January 21, 2004, when C.E. continued not to return to school, the District filed a PINS petition in Family Court of the State of New York, County of Suffolk. (*Stern Decl.*, Ex. CCC.)

At her deposition, plaintiff Victoria acknowledged that the PINS petition was filed because the District wanted her to send C.E. back to "Center Moriches School." In her opposition papers, apart from her conclusory statement that defendants escalated their "attack on plaintiff Victoria by filing a PINS petition and making a false complaint of child abuse to Child Protective Services," plaintiff has not proffered any evidence that the District's filing the petition in Family Court and the report to Child Protective Services for plaintiff Victoria's failure to send her daughter back to school was false or was made in retaliation for plaintiff's complaints of discrimination against the District. (Pls. Memo of Law in Opp. to Dist. Defs. Mtn. at 38.) To the contrary, plaintiffs state that "[t]he sole motive for Defendant School District to insist on retaining Plaintiff (C.E.) as a student was to continue to receive the grant of money Defendant [sic] from the federal government based on Plaintiff's ethnicity as Native American." (*Id.* at 27.) Since there is no evidence that the filing of the PINS Petition and report to Child Protective Services were made for unlawful or retaliatory means, plaintiff Victoria is unable as a matter of law to establish a First Amendment retaliation claim.

Accordingly, the undersigned recommends that the district court grant the District Defendants' motion for summary judgment on plaintiff Victoria's First Amendment claim.

**E. Individual Liability**

■ In order to survive a summary judgment motion on a Section 1983 claim

---

**24.** The New York Family law defines a "person in need of supervision" as "[a] person less than eighteen years of age who does not attend school in accordance with the provisions of part one of article sixty-five of the education law." N.Y. Fam. Ct. Act § 712. In turn, Part I Article 65 of the Education Law requires each minor from ages six to sixteen to attend full time instruction, including students on Indian reservations. N.Y. Educ. Law § 3205. In compliance with the Education Law, the District set forth its policy for filing a PINS petition for truancy in its Code of Conduct for the District. (*Stern Decl.*, Ex. CC at 14.)

against an individual defendant in his or her individual capacity, plaintiffs must show "(a) that the defendant is a 'person' acting 'under the color of state law,' and (b) that the defendant caused the plaintiff to be deprived of a federal right." *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 122 (2d Cir.2004) (citation omitted). In addition, "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [S]ection 1983." *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir.1977). "The Supreme Court has recognized that an individual is acting under color of state law when exercising power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *Valenti v. Massapequa Union Free Sch. Dist.*, No. 09–CV–977 (JFB)(MLO), 2010 WL 475203, at *8, 2010 WL 475203, at *8 (E.D.N.Y. Feb. 5, 2010) (internal quotation marks and citations omitted).

▮▮▮ The undersigned will assume that plaintiffs have established that, with the exception of defendant Nelson,[25] the individual defendants acted under color of state law insofar as they were each a

school employee acting in their official capacities during the events complained about in the complaint. *See Back,* 365 F.3d at 123 ("state employment is generally sufficient to render the defendant a state actor"); *see also Bliss v. Putnam Valley Cent. Sch. Dist.,* No. 7:06–cv–15509 (WWE), 2011 WL 1079944, at *9 (S.D.N.Y. Mar. 24, 2011). With respect to the individual school defendants, plaintiffs have failed to establish that such defendants were personally involved in a constitutional violation or caused plaintiffs to be deprived of a federal right. Here, plaintiffs' general allegations that "Defendants Trocchio, Bracco, Cruz, Treadwell[26], Straub and Kretsos were directly involved in the constitutional violations against [p]laintiffs by engaging in selective/discriminatory enforcement and fabricating false statements about the incidents on April 4, 2003, to cover up Defendant Kretsos' actions both during the alleged investigations by [d]efendant Bracco and at the hearing," (Pls. Mem. in Opp. Dist. Defs. Mtn. at 30), are insufficient, as a matter of law, to defeat summary judgment. Plaintiffs' claims against the individual defendants rely on the same underlying conduct and argu-

**25.** Defendant Nelson was not a school employee but was the independent hearing officer who conducted the Superintendent's hearing for the infant plaintiffs in this case. Nelson presided over the disciplinary hearings, heard arguments and testimony, and issued a decision in the form of a recommendation to the Superintendent. (*Stern Decl.,* Exs. KK at 1; E.) Having acted in this quasi-judicial role, Nelson is entitled to quasi-judicial immunity from plaintiffs' federal claims against him in his individual capacity. *See Sassower v. Mangano,* 927 F.Supp. 113, 120 (S.D.N.Y.1996) ("Here, quasi-judicial immunity, which bars claims against administrative law judges ... performing judicial functions, protects [defendant] hearing officer"); *Scotto v. Almenas,* 143 F.3d 105, 110 (2d Cir.1998) ("[a]bsolute immunity for judicial acts is well established"). In any event, having found no

sufficient evidence for a jury to find that defendants, including Nelson, acted to deprive the plaintiffs of a federal right, plaintiffs' claims against defendant Nelson fail. Accordingly, the undersigned recommends that plaintiffs' motion against defendant Nelson be granted.

**26.** Plaintiffs conclusory allegation in their opposition papers that defendant "Treadwell was aware of the disparate discipline imposed upon Native American students and failed to address said practices by Defendants, even though her duties as the liaison between the Native American reservation and defendant school District included address [sic] such issues" (Pls. Mem. in Opp. Dist. Defs. Mtn. at 31), without more, fails to raise a genuine issue of material fact that she violated plaintiffs constitutional rights.

ments as those made against the District Defendants and defendant Kretsos in their official capacities. As plaintiffs have not proffered any additional evidence for these claims against the individual defendants nor have shown that such defendants caused plaintiffs to be deprived of a federal right, *see supra,* plaintiffs claims against the individual defendants for violations of their constitutional rights fail as a matter of law. *See Back,* 365 F.3d at 122 ("In order to establish individual liability under § 1983, a plaintiff must show ... that the defendant caused the plaintiff to be deprived of a federal right."); *see Dunk v. Brower,* 2009 WL 650352, at *8 (S.D.N.Y. 2009) (observing that the "Supreme Court has found that if there is no constitutional violation, there can be no liability, either on the part of the individual officer of the government body). Accordingly, the undersigned recommends that the district court grant the District Defendants' and defendant Kretsos' motions for summary judgment on plaintiffs' Section 1983 claims against the individual defendants.

### F. Municipal Liability

 "A plaintiff who seeks to recover against a municipality under § 1983 must show that the violation of his constitutional rights resulted from a municipal policy or custom." *Davis v. City of New York,* 75 Fed.Appx. 827, 829 (2d Cir.2003) (citations omitted); *see Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A school district may be liable for the deprivation of a citizen's rights "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983" *Monell,* 436 U.S. at 694, 98 S.Ct. 2018; *see also Fitzgerald v. Barnstable Sch. Comm.,* 555 U.S. 246, 258–59, 129

S.Ct. 788, 172 L.Ed.2d 582 (1989) (discussing school district liability under § 1983). A municipality may not, however, be held liable under Section 1983 on a respondeat superior theory of liability for its employees' alleged constitutional violations. *See Monell,* 436 U.S. at 691, 98 S.Ct. 2018 ("a municipality cannot be held liable solely because it employees a tortfeasor, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory"); *Sorlucco v. N.Y.C. Police Dep't,* 971 F.2d 864, 870 (2d Cir.1992) ("A municipality may not be held liable under § 1983 simply for the isolated unconstitutional acts of its employees"); *DeFabio,* 658 F.Supp.2d at 497 ("Municipalities, including school boards, cannot be held vicariously liable for the actions of an employee under § 1983."). Instead, there must be a "direct causal link between the municipal policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris,* 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).

 In the instant case, plaintiffs have failed to establish the violation of any protected constitutional rights by defendants. "[I]t is fundamental that [Section] 1983 creates no independent, substantive constitutional rights but rather is a vehicle for enforcing such rights," *Rosa R. v. Connelly,* 889 F.2d 435, 440 (2d Cir.1989). Since there are no underlying constitutional violations, the plaintiffs' claims for municipal liability against the District Defendants fails. *See Khan v. Ryan,* 145 F.Supp.2d 280, 285 (E.D.N.Y.2001) ("If there is no underlying constitutional violation by a municipal official, the municipality is not liable"); *Segal v. City of New York,* 459 F.3d 207, 219 (2d Cir.2006) ("Because the district court properly found no underlying constitutional violation, its decision not to address the municipal defendants' liability under *Monell* was entirely correct"); *see*

*also Collins v. City of Harker Heights*, 503 U.S. 115, 121, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992). Therefore, the undersigned recommends that the district court grant the District Defendants' motion for summary judgment on plaintiffs' municipal liability claims.

## III. Section 1985 and Section 1986 Claims

Plaintiffs allege that the defendants are liable under Section 1985 for conspiring to deprive the plaintiffs of their constitutional and civil rights, as set forth in their Section 1983 claims. Plaintiffs further claim that defendants are liable under Section 1986 for failing to prevent this conspiracy.

■■■ Section 1985 provides in pertinent part that:

If two or more persons in any State … conspire … for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws … the person so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

42. U.S.C. § 1985(3). Section 1985 requires that plaintiffs establish: (1) a conspiracy; (2) for the purpose of depriving any person or class of persons equal protection of the laws; and (3) an act in furtherance of conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a U.S. citizen. *See Emmons v. City University of New York*, 715 F.Supp.2d 394 (E.D.N.Y.2010). "[A] § 1985(3) violation must be motivated by some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirator's action." *Id.* at 416 (citing *Griffin v. Breckenridge*, 403 U.S. 88, 102, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971)). "In other words, the intended victims must be victims not because of any malice the conspirators have toward them, but because of their membership in or affiliation with a particular class." *Id.*

■■■ Section 1985(3) does not create any substantive rights in and of itself. *Knight v. City of New York*, 303 F.Supp.2d 485, 501–02 (S.D.N.Y.2004). Rather, it "provides a civil cause of action only when some other defined federal right has been violated." Given the undersigned has concluded that plaintiffs have failed to prove any claim establishing a violation of a federal or constitutional right, there is no basis on which plaintiffs can seek recovery under § 1985(3). *See O'Bradovich v. Village of Tuckahoe*, 325 F.Supp.2d 413, 426–27 (S.D.N.Y.2004) ("In the absence of any claim establishing a violation of civil rights, the court must also dismiss claims of conspiracy brought under § 1985"); *Knight*, 303 F.Supp.2d at 501–02 (same).

■■■ In turn, plaintiffs' inability to state a claim for conspiracy under § 1985 is fatal to their § 1986 claim against the District Defendants for failure to prevent the conspiracy. In order to state a claim under Section 1986, plaintiffs must state a valid cause of action under Section 1985. "Section 1986 imposes liability on individuals who have knowledge of a conspiracy under [Section] 1985 but fail to take action to prevent them." *Jenkins v. N.Y. City Dep't of Educ.*, No 10 Civ. 6159(BSJ)(THK), 2011 WL 5451711, at *5 (S.D.N.Y. Nov. 9, 2011) (citing 42 U.S.C. § 1986). That is to say, a Section 1986 claim "must be predicated on a valid § 1985 claim" *See Brown v. City of Oneonta*, 221 F.3d 329, 341 (2d Cir.2000) (citation and quotation marks omitted). Because the undersigned concludes that the plaintiffs fail to state a claim under Section 1985, the plaintiffs necessarily cannot sus-

tain a cause of action for failure to prevent a conspiracy under Section 1986.

Accordingly, the undersigned recommends that the district court grant the District Defendants' and defendant Kretsos' motions for summary judgment on plaintiffs Section 1985 and Section 1986 claims.

## IV. Title VI Claims [27]

 Title VI of the Civil Rights Act of 1964 provides as follows:

No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

42 U.S.C. § 2000d. "To establish a claim under Title VI, plaintiff must show: (1) that the entity involved engaged in racial or national origin discrimination; (2) the entity involved is receiving federal financial aid [28]; and (3) plaintiff was an entitled beneficiary of the program or activity receiving the aid." *Babiker v. Ross Univ. School of Medicine*, No. 98 CIV

1429(THK), 2000 WL 666342, at *4 (S.D.N.Y. May 19, 2000).

 There is no dispute the District receives federal funding through the Indian Education Formula Grant or that plaintiffs are recipients of the grant as Native American students. (*Brewington Decl.*, Exs. AAA, ZZ.) Thus, plaintiffs' claim turns on whether they can demonstrate that the District was engaged in race or national origin discrimination. With respect to this element plaintiff must show "that the defendant discriminated against him on the basis of race, that the discrimination was intentional, and that the discrimination was a substantial or motivating factor for the defendant's actions." *Tolbert v. Queens Coll.*, 242 F.3d 58, 69 (2d Cir.2001) (internal quotation marks and citations omitted). Hence, to be cognizable under Title VI, defendants' discriminatory intent must "actually play[ ] a role in" and have a "determinative influence" on the adverse action. *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993). Plaintiffs assert that the District discriminated against them on the basis of race and national origin by defendants' disparate treatment and creation of a hostile education environment.[29]

**27.** Plaintiffs' Sixth and Seventh Causes of Action refer to "Title IX" and 42 U.S.C. § 2000d. 42 U.S.C. § 2000d, however, is commonly referred to as Title VI. It appears that plaintiffs meant to assert a violation of Title VI which prohibits discrimination on the ground of race, color or national origin, not Title IX, which prohibits gender discrimination in education which has not been alleged in this action. *See Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998). The undersigned will examine plaintiffs' claims under Title VI.

**28.** In a Title VI action, "[t]he proper defendant ... is the entity that receives financial assistance." *Kelly v. Rice*, 375 F.Supp.2d 203, 208 (S.D.N.Y.2005). Plaintiffs' Seventh Cause of Action alleges a Title VI claim against defendant Veronica Treadwell.

(Compl. ¶¶ 128–35.) It is well-settled that a defendant may not be sued in her individual capacity because "the individual is not the recipient of the federal funding." *Goonewardena v. New York*, 475 F.Supp.2d 310, 328 (S.D.N.Y.2007); *see DT v. Somers Cent. Sch. Dist.*, 588 F.Supp.2d 485, 493 n. 11 (S.D.N.Y. 2008). Accordingly, the undersigned recommends that the district court grant the District Defendants' motion for summary judgment on plaintiffs' Title VI claim against defendant Treadwell.

**29.** The District Defendants seek summary judgment with respect to the infant plaintiffs' Title VI claim based on alleged retaliation for plaintiffs' opposition to racial discrimination. (Compl. ¶ 126.) In their opposition papers, plaintiffs failed to address or respond to any of defendants' arguments regarding this

## A. Disparate Treatment

 Title VI claims are governed by the same three-part burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) that is applied to claims brought under Title VII. *See Solomon v. Uniondale Union Free Sch. Dist.*, No. 03–CV2415, 2007 WL 608137, at *3 (E.D.N.Y. Feb. 17, 2007); *see also Koumantaros v. City University of New York*, No. 03 Civ. 10170(GEL), 2007 WL 840115, at *7 (S.D.N.Y. Mar. 19, 2007). In *Koumantaros*, the court set forth the analysis as follow:

> To establish a clam under *McDonnell Douglas*, plaintiff must first successfully assert a prima facie claim against defendants. If plaintiff makes out a prima facie case, the burden shifts to the defendant to show a legitimate, nondiscriminatory reason for its conduct. Plaintiff then has the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. Plaintiff may show a prima facie case under Title VI through direct evidence of discriminatory conduct or where direct evidence is unavailable, as it is here, through indirect evidence, by demonstrating that: (1) she is a member of a protected class; (2) she suffered an adverse action in pursuit of her education by defendant; (3) she was treated differently from similarly situated students who were not members of the protected class; and (4) she was quali-

fied to continue in her educational pursuit.

2007 WL 840115, at *7 (internal quotation marks and citations omitted).

Plaintiffs have failed to establish a prima facie case of discrimination. In their opposition papers, plaintiffs assert that their selective enforcement argument under Title VI is the same as under their Equal Protection Clause argument under Section 1983. (Pls. Mem. in Opp. to Dist. Defs. Mtn. at 39–40.) For the reasons articulated above, the plaintiffs inability to establish a triable case of discrimination based on race or national origin and for disparate treatment under Section 1983 is equally fatal to plaintiffs' claims under Title VI.

## B. Hostile Education Environment

Plaintiffs' aver that defendants' actions created a hostile education environment by subjecting plaintiffs to "overzealous and stringent disciplinary measures, permitting defendant Kretsos to assault plaintiffs C.E. and J.E. without intervening and permitting defendant Kretsos to use racially derogatory language without consequence," and that defendants were deliberately indifferent to such known discrimination. (Pls. Mem. in Opp. to Dist. Defs. Mtn. at 40–41.) As discussed *supra*, the was no evidence of any constitutional violation with respect to the District's disciplinary decisions or the defendants' conduct during and after the April 4, 2003 incident. Defendant Kretsos' actions during the April 4, 2003 altercation, while lamentable if true, do not rise to the level of actionable racial harassment under federal law.

---

claim. The undersigned therefore deems this claim abandoned and recommends that the district court grant summary judgment in favor of the District Defendant with respect to this claim. *See Taylor v. City of New York*, 269 F.Supp.2d 68, 75 (E.D.N.Y.2003); *Santia-*

*go v. City of New York*, No. 05–CV–3668 (RRM)(VVP), 2009 WL 935720, at *11 n. 19 (E.D.N.Y. Mar. 31, 2009); *Sorto–Romero v. Delta Int'l Machinery Corp.*, No. 05–CV–5172 (SJF)(AKT), 2007 WL 2816191, at *9 (E.D.N.Y. Sept. 24, 2007).

To establish a claim for hostile education environment under Title VI, plaintiffs must establish "(1) the alleged harassment was so severe, pervasive, and objectively offensive that it deprived the plaintiff of access to the educational opportunities or benefits provided by the school; (2) the funding recipient had actual knowledge of the ... harassment; and (3) the funding recipient was deliberately indifferent to the harassment." *TC v. Valley Cent. Sch. Dist.*, 777 F.Supp.2d 577, 594 (S.D.N.Y.2011). Deliberate indifference is "found both when the defendant's response to known discrimination is clearly unreasonable in light of the known circumstances ... and when remedial action only follows after a lengthy and unjustifiable delay." *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 751 (2d Cir.2003) (citations omitted). Thus, to establish a deliberate indifference claim under Title VI plaintiffs must show that the District "(1) had actual knowledge of, and (2) was deliberately indifferent to (3) harassment that was so severe, pervasive and objectively offensive that it (4) deprived the victim of access to the educational benefits or opportunities provided by the school." *Rodriguez v. New York University*, 2007 WL 117775, at *6 (S.D.N.Y. Jan. 16, 2007) (internal quotation marks and citations omitted).

Here, there is no evidence in the record that the District Defendants had actual prior notice (i) that there would be an incident on April 4, 2003 or (ii) of defendant Kretsos' alleged propensity to commit racial misconduct when dealing with hostility among students. Significantly, there is testimony by each the infant plaintiffs that prior to the April 4, 2003 incident, they had no difficulties with Kretsos and had not heard him use "racial slurs or curses at students." (*Stern Decl.*, Exs. G at 186–87; K at 208–09; H at 156–57; I at 197–98.) Next, there is no evidence that the District acted with deliberate indifference to the fighting that ensued among the students or to Kretsos' behavior in "breaking up" the riot. To the contrary, the record shows that defendants Bracco and Trocchio, and others, acted to quell the riotous scene and to remove Kretsos away from the students and into the girl's bathroom. Defendant Bracco thereafter conducted an investigation into the incident and plaintiffs' allegations of assault, during which he spoke to the security guards on duty, staff members and students. Following the investigation, defendant Cicero suspended Kretsos for thirty (30) days without pay.

Even more, the environment that the infant plaintiffs were allegedly subjected to was the result, in part, of their own actions, including their participation in the riot, rather than any deliberate indifference on the part of the District Defendants. Following the infant plaintiffs' suspensions, the District provided them with home instruction. In view of these circumstances, there is no evidence in the record that would permit a reasonable jury to find the infant plaintiffs endured harassment so severe and pervasive as to have effectively denied them access to educational resources and opportunities. *Cf. Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 651, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999). Accordingly, the undersigned recommends that the District Defendants' motion for summary judgment on plaintiffs' Title VI claims be granted.

## V. Defendants Qualified Immunity Defense

Defendants argue that the individual defendants are all protected by the qualified immunity defense.

"The qualified immunity doctrine shields governmental officials performing discretionary functions from liability for

civil damages 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Poe v. Leonard*, 282 F.3d 123, 131 (2d Cir.2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)); *see also Loria v. Gorman*, 306 F.3d 1271, 1281 (2d Cir.2002).

 Inasmuch as the that the plaintiffs have failed to prove a constitutional violation or that they suffered any unlawful discrimination,[30] the issue of the individual defendants' qualified immunity defense is moot. "Without an underlying constitutional violation, qualified immunity cannot attach." *Cathedral Church of the Intercessor v. The Incorporated Village of Malverne*, 353 F.Supp.2d 375, 391 (E.D.N.Y. 2005); *Rivera v. Goord*, 253 F.Supp.2d 735, 757 (S.D.N.Y.2003) (following the grant of summary judgment, the court does "not address the issue of defendants' qualified immunity as the issue is moot").

Accordingly, the undersigned recommends that the district court deny defendants' motions for summary judgment on this basis as moot.

## VI. State Law Claims

 Having recommended that the district court grant summary judgment on plaintiffs' federal claims, the only remaining claims are those arising under state law, specifically, for negligence, assault, battery, intentional infliction of emotional distress and violations under New York State Education Law. Under 28 U.S.C. § 1367(c)(3), the undersigned considers whether the district court should continue to exercise jurisdiction over these remaining claims. "In determining whether to continue to retain jurisdiction, district courts consider factors such as judicial economy, convenience, fairness and comity." *DeFabio*, 658 F.Supp.2d at 499 (citation omitted). Where, as here, "federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state law claims." *Valencia v. Lee*, 316 F.3d 299, 305–06 (2d Cir.2003); *see also Marcus v. AT & T Corp.*, 138 F.3d 46, 57 (2d Cir. 1998) ("In general, where the federal claims are dismissed before trial, the state claims should be dismissed as well."); *Baylis v. Marriott Corp.*, 843 F.2d 658, 665 (2d Cir.1988) ("When all bases for federal jurisdiction have been eliminated from a case so that only pendent state claims remain, the federal court should ordinarily dismiss the state claims.").

 Moreover, comity suggests that this case would be better litigated in state court where the conduct of state actors can be adjudicated by the state court under state law. *Saggio v. Sprady*, 475 F.Supp.2d 203, 212–13 (E.D.N.Y.2007) (declining to exercise supplemental jurisdiction where "the case involves the conduct of state actors under state law"). This is particularly the case here where the conduct at issue involves local interaction between public school officials and students and their parents. *Cf. Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) (observing that states and school officials have the "comprehensive authority ... consistent with fundamental constitutional safeguards, to prescribe and control

---

**30.** Having found that the plaintiffs have failed to prove a constitutional violation or that they suffered any unlawful discrimination, the undersigned has recommended that defendants' motions for summary judgment be granted on the merits. Accordingly, the undersigned does not reach the sufficiency of process challenge with respect to defendants Trocchio, Cicero and Kretsos.

conduct in the schools"); *Brown v. Bd. of Educ.*, 347 U.S. 483, 493, 74 S.Ct. 686, 98 L.Ed. 873 (1954) ("education is perhaps the most important function of state and local governments"). Thus, in the absence of federal claims implicating federal policies, the undersigned concludes that the remaining claims are best left to the state court. Accordingly, the undersigned recommends that the district court decline to retain jurisdiction over the remaining state law claims given the absence of any federal claims that survive summary judgment, and dismiss the state claims without prejudice pursuant to 28 U.S.C. § 1367(c)(3).

## CONCLUSION

For the reasons set forth above, the undersigned respectfully reports and recommends that District Defendants' and defendant Kretsos' motions for summary judgment on plaintiffs' federal claims be granted, and the district court decline to exercise supplemental jurisdiction over plaintiffs' pendent state claims and dismiss them without prejudice.

## OBJECTIONS

A copy of this Report and Recommendation is being served by the Court on all parties. Any objections to this Report and Recommendation must be electronically filed with the Clerk of the Court within 14 days. Failure to file objections within this period waives the right to appeal the District Court's Order. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72; *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.*, 596 F.3d 84, 92 (2d Cir.2010); *Beverly v. Walker*, 118 F.3d 900, 902 (2d Cir.1997); *Savoie v. Merchants Bank*, 84 F.3d 52, 60 (2d Cir.1996).

August 7, 2012